# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **RICKY L. HUNTER, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.:  4:15-CV-0839-VEH** |
| | ) |
| **ETOWAH COUNTY COURT** | ) |
| **REFERRAL PROGRAM, LLC, et** | ) |
| **al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs[1] initiated this civil rights lawsuit and purported class action on July 1, 2013, against Defendants City of Attalla (the "City"), the Etowah County Court Referral Program, LLC (the "ECCRP"), and the ECCRP's Executive Director, Lenesha Zaner ("Ms. Zaner").[2] (*Brannon*, Doc. 1). Plaintiffs have amended their complaint multiple times. The last version was filed on April 9, 2015. (*Brannon*,

---

[1]  The two Plaintiffs currently in the case are Ricky L. Hunter ("Mr. Hunter") and Dustin A. Loyd ("Mr. Loyd").

[2]  Plaintiffs' claims were originally part of another action, *Brannon, et al. v. City of Gadsden, et al.*, No. 4:13-CV-1229-VEH. On May 20, 2015, the Court severed all the claims of the Attalla Plaintiffs from the *Brannon* action. (Doc. 1); (*see also Brannon*, Doc. 70 (N.D. Ala. May 20, 2015)). Mr. Loyd is a Plaintiff in this severed action as well as in the *Brannon* case.

Docs. 22, 43, 45, 63). By virtue of the pro tanto stipulated dismissal entered on August 9, 2016 (doc. 43), Plaintiff Charles Cantrell is no longer a party to this action.

Pending before the Court are the following motions:

- Motion for Summary Judgment (doc. 66) filed by the City (the "City's Motion") on May 22, 2017;

- Motion for Summary Judgment (doc. 73) filed by the ECCRP and Ms. Zaner (the "ECCRP Defendants' Motion") on May 25, 2017; and

- Objection to Admissibility and Motion To Strike Declaration of Richard Rhea filed by Plaintiffs (the "Strike Motion") on October 19, 2017.

The Court has reviewed the parties' filings offered in support of and opposition to the motions. (Docs. 67-72, 74-76, 79-83, 87-89, 91). For the reasons set out below, the City's Motion is due to be granted in part and otherwise termed as moot. The ECCRP Defendants' Motion is due to be granted in part and otherwise denied or termed as moot. Finally, the Strike Motion is due to be termed as moot.

## II.     STANDARDS

### A.     Summary Judgment

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R . CIV. P. 56(a). All reasonable doubts about the facts and all justifiable inferences are resolved

in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.    Evidentiary Rulings

"All evidentiary decisions are reviewed under an abuse-of-discretion standard" without regard to the type of proof challenged. *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *id.* at 143 (concluding that the Eleventh Circuit Court of Appeals committed reversible error "[i]n applying an overly 'stringent' review to [the district court's experts' testimony] ruling [because] it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review"). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 F. App'x 185, 196 (11th Cir. 2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005)).

Moreover, as the Eleventh Circuit has made clear, not every incorrect evidentiary ruling constitutes reversible error:

> Auto-Owners' second argument is that it is entitled to a new trial on the basis of what it describes as a number of erroneous evidentiary rulings by the district court. Evidentiary rulings are also reviewed under an abuse of discretion standard. *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir. 1989). Moreover, even if Auto-Owners can show that certain errors were committed, the errors must have affected "substantial rights" in order to provide the basis for a new trial. *See* FED. R. EVID. 103(a). "Error in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties." *Perry*, 734 F.2d at 1446. *See also Allstate Insurance Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988).

*Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993). Therefore, even the existence of many evidentiary errors does not guarantee the party appealing a new trial. Instead, such erroneous rulings by a district court must "affect the substantial rights of the parties" for reversible error to occur.

## III. FACTUAL BACKGROUND[3]

Both Plaintiffs have been convicted and/or pled guilty to misdemeanor offensives within the jurisdiction of the Attalla Municipal Court (the "AMC").

---

[3] Keeping in mind that when deciding a motion for summary judgment the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

Plaintiffs' civil rights suit challenges Defendants' practices under a court referral program (the "CRP") that the AMC ordered them to participate in as a requirement of their probation and a suspension of their sentences tied to their misdemeanor convictions.

Plaintiffs have summarized their respective AMC and CRP proceedings (doc. 83 at 7-26 ¶¶ 1-105) as follows.[4]

## MR. LOYD

On July 23, 2009, Mr. Loyd was sentenced by the AMC on a misdemeanor charge of public intoxication (MC09-0461). Mr. Loyd received a 60-day jail sentence, which was suspended, and was ordered to enroll in the CRP. Based upon the ECCRP records filed in the *Brannon* case that relate to Mr. Loyd, on September 22, 2009, the ECCRP issued a return to court form notifying Judge Kenneth Robertson of the AMC that Mr. Loyd had been terminated from the CRP with respect to AMC case number 09-461.[5] (*Brannon*, Doc. 165-3 at 6 (N.D. Ala. July 3, 2017)).[6] On March 1, 2011, the

---

[4] The nature of this Court's opinion on summary judgment does not require it to address the bulk of the voluminous facts admitted and/or contested by the parties. Instead, the Court's analysis turns upon the additional undisputed facts proposed by Plaintiffs (doc. 80 at 6-25 ¶¶ 1-105); (doc. 83 at 7-26 ¶¶ 1-105) to both Rule 56 motions to which Defendants have provided some challenges and/or clarifications in their respective reply briefs. (Doc. 88 at 3-11 ¶¶ 6, 22, 26, 31-34, 36-38, 49, 70-73, 84, 95-98, 99-100, 101, 103-05); (Doc. 89 at 3-6 ¶¶ 4-5, 15, 19, 26, 29, 36, 42, 46, 48, 50, 54-57, 60, 62, 67, 77, 85, 87-88). The designation "CAF" stands for a fact added by the Court that helps to clarify the status of the evidentiary record before it on summary judgment.

[5] Plaintiffs' summary of additional facts pertaining to Mr. Loyd in this action does not mention this particular evidence. However, the document was identified in the *Brannon* action as

ECCRP call logs note that Mr. Loyd was supposed to re-enroll in the CRP, however, no AMC written order to that effect can be found. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. Mr. Loyd was scheduled for an evaluation on March 14, 2011.

On March 15, 2011, AMC records show that Mr. Loyd contacted the AMC to request his time for participation in the CRP run concurrent with an Etowah County case he had in front of Judge Rhea. The AMC set the matter for hearing on April 21, 2011.

Throughout March, April and May, Mr. Loyd was doing well with the CRP requirements, showing up for drug tests, color-code screening, and paying his fees. There are no notes in the ECCRP call log indicating that he failed to show up or complete a requirement. However, on July 14, 2011, the ECCRP notes that Mr. Loyd "owes too much to test."

Because Mr. Loyd was sentenced on July 23, 2009, he maintains that the two-year statutory maximum period for probation and/or the CRP should have expired on July 23, 2011. There is no AMC record to indicate that his probation was revoked or that his probationary period was tolled for any reason. At the same time,

clearly applicable to Mr. Loyd's AMC case. (*Brannon*, Doc. 163 at 17 ¶ 35 (N.D. Ala. July 3, 2017)).

[6] All page references to Doc. 165-3 in the *Brannon* case correspond with the CM/ECF numbering system.

the record lacks any evidence of a written order from the AMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his AMC misdemeanor case. CAF. Mr. Loyd continued to be subjected to the CRP requirements beyond July 23, 2011.

On July 26, 2011, Mr. Loyd failed to show up for a color-code drug test. On August 1, 2011, Mr. Loyd paid his June and July color-code fees and late fees. On August 3, 2011, Mr. Loyd returned to the ECCRP for a color-code drug test. On August 16, 2011, Mr. Loyd came to the ECCRP for a color-code drug test.

On August 24, 2011, the ECCRP called Mr. Loyd to report in by August 31, 2011, and pay $100 or he would be terminated from the CRP. There is no indication that he was notified in writing of this deadline. At the same time, the absence of a written notice does not mutually exclude an oral contact being made by the ECCRP. CAF. On August 30, 2011, Mr. Loyd returned to the ECCRP for monitoring. He paid monitoring fees, August color-code fees, and late fees. It is noted that he had a "bad attitude about fees."

On September 1, 2011, Mr. Loyd reported to the ECCRP for color-code testing. On September 12, 2011, Mr. Loyd was a no-show for a color-code drug test. On September 21, 2011, Mr. Loyd reported to the ECCRP for color-code testing. At this time, he claims to have started over in the CRP because of his failure to show up for

drug testing on September 12, 2011. There is no record of a return to court form for the failure to show up for the drug test. There is no record of a AMC written order for Mr. Loyd's participation in the CRP to start over. At the same time, the absence of written order does not mutually exclude an oral order by the AMC. CAF. Finally, there is no indication that the ECCRP had ever started Mr. Loyd over previously due to his failure to show up for testing.

On October 11, 2011, Mr. Loyd reported to the ECCRP for color-code screening but was not drug tested because he "owe[d] too much to test." On October 24, 2011, Mr. Loyd reported to the ECCRP for color-code screening, but was not drug tested because he "owe[d] too much to test." On November 2, 2011, Mr. Loyd was a no-show for color-code screening and was terminated from the CRP.

On November 3, 2011, the ECCRP issued a return to court form notifying the AMC that Mr. Loyd failed to report for color-code screening on September 12, 2011, and November 2, 2011. The ECCRP also noted that he owed too much to test on October 11, 2011, and October 24, 2011. The form also requested that a warrant be issued for Mr. Loyd's arrest. The return to court form also referenced Mr. Loyd's no-show on September 12, 2011, but he had already started over on the CRP requirements and had reported to the ECCRP at least three times after that earlier no-show in September.

On November 17, 2011, the AMC issued a Notice of Return to Court and set a court date of January 19, 2012. On January 19, 2012, Mr. Loyd was found in "Contempt/CRO"[7] and ordered to serve 5 days in jail. The AMC also ordered Mr. Loyd to re-enroll in the CRP upon his release. Mr. Loyd was set to be released from jail on January 24, 2012, but was actually released on January 26, 2012, "per Captain Higgins." Thus, Mr. Loyd actually served seven days in jail rather than five.

On February 3, 2012, the ECCRP issued a return to court form notifying the AMC that Mr. Loyd failed to re-enroll in the CRP after his release from Attalla City Jail. The form also requested a warrant to be issued for his arrest. On this same date, Mr. Loyd also was noted as terminated in MIDAS.[8] Although the AMC ordered Mr. Loyd to re-enroll in the CRP upon his release, there was no deadline by which to do so. At the same time, the absence of a written order does not mutually exclude an oral order indicating a deadline. CAF. There is also no indication that Mr. Loyd was given any written notice that he had a deadline to enroll or that he was about to be terminated from the CRP.

On March 20, 2012, a new case management plan was submitted for Mr. Loyd, but it was designated as for his Gadsden Municipal Court ("GMC") case. Mr. Loyd

---

[7] "CRO" stands for court referral order.

[8] Plaintiffs do not explain what "MIDAS" is in their opposition briefs.

was shown as active in MIDAS for his GMC case as well.

On March 26, 2012, Mr. Loyd called the ECCRP. On March 27, 2012, Mr. Loyd reported to the ECCRP, received drug testing pursuant to color-code screening, signed a new case management plan, and scheduled a new evaluation for April 12, 2012. It is also noted that Mr. Loyd owed $110 in back fees. After Mr. Loyd was terminated on February 3, 2012, there was is no written record of any AMC order for him to re-enroll in the CRP. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. Also, the record lacks any evidence of a written order from the AMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his AMC misdemeanor case. CAF.

On April 4, 2012, the ECCRP contact log notes that Mr. Loyd did not show up for a color-code drug test. On April 12, 2012, Mr. Loyd's GMC case was closed per written order.

On April 13, 2012, the ECCRP issued a return to court form notifying the AMC that Mr. Loyd failed to report in for an evaluation on April 12, 2012, that he failed to report for color-code testing on April 4, 2012, and that he failed to pay fees. The form also requested the AMC to set a show cause hearing.

It should be noted that Mr. Loyd was terminated from the CRP on February 3,

2012, and there is no record of any court order for him to re-enroll in the CRP. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. Additionally, the record lacks any evidence of a written order from the AMC indicating that Mr. Loyd's obligation to complete the CRP was no longer a condition of his suspended sentence for his AMC misdemeanor case. CAF. There is also no record of the missed evaluation on April 12, 2012, in the ECCRP contact logs.

On May 11, 2012, the AMC issued a Notice of Return to Court and set a court date for June 14, 2012. On July 2, 2012, a complaint was filed against Mr. Loyd for Failure To Appear on June 14, 2012. The complaint was signed by the City. On that same date, an Alias Warrant for Arrest for Failure of Defendant To Appear was entered by a magistrate. The warrant and the complaint signed by the City have corresponding warrant numbers.

On September 29, 2012, the Alias Warrant was stamped as cleared by Circuit Court Judge Millican. Mr. Loyd hired an attorney, Eddy Cunningham, as a result of the warrant. On October 11, 2012, Mr. Loyd was released from the CRP per AMC order.

As noted above, Mr. Loyd was sentenced on July 23, 2009. Mr. Loyd maintains that the statutory maximum period for probation, the suspended sentence, and/or the

CRP requirements should have expired on July 23, 2011. After this statutory maximum period had expired, Mr. Loyd continued to be subjected to the CRP requirements for more than a year–until October 11, 2012–when he was released from the CRP and his AMC case was closed.

After October 11, 2012,[9] Mr. Loyd was scheduled for at least one monitoring session, called by the ECCRP at least twice, color-coded at least eleven times, and returned to court at least three times. Mr. Loyd was also charged drug-testing fees, monitoring fees, and/or late fees at least twice during this time. Mr. Loyd maintains that he was also incarcerated for at least seven days as a direct result of his failure or inability to comply with the CRP requirements after the statutory maximum period had expired.

Mr. Loyd had at least one complaint and warrant sworn out against him by the City that directly stemmed from his inability or failure to comply with the CRP requirements beyond the statutory maximum. He was never arrested as a result of that complaint or warrant, but he was required to hire an attorney to represent him in that matter and have the warrant recalled.

Mr. Loyd maintains that the ECCRP was actively and knowingly pursuing him for fees and failures under the CRP during a period of time that he should have been

_____

[9] The Court believes that Plaintiffs actually mean after July 23, 2011, here.

terminated from it and not been ordered by the AMC to re-start or re-enroll.

## MR. HUNTER

On March 29, 2007, Mr. Hunter was sentenced by the AMC on a misdemeanor charge of unlawful possession of drug paraphernalia (MC07-0143). He was sentenced to a 60-day jail sentence, which was suspended, and ordered to enroll in the CRP.

On April 16, 2007, Mr. Hunter enrolled in the CRP and received a case management plan that required twelve months of monitoring, color-code screening and attending two self-help meetings (AA) a week. On April 22, 2008, the ECCRP re-started Mr. Hunter on his CRP requirements because he had failed to attend the requisite number of AA meetings and, as a result, he received a new case management plan. Mr. Hunter points out that he was testing clean and paying, the only issue was that he lacked AA meetings. At the same time, attendance at AA meetings was one of the requirements of his suspended sentence ordered by the AMC. CAF.

There is no written order from the AMC to re-start Mr. Hunter on the CRP. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. There also is no indication that the ECCRP made a written report to the AMC about Mr. Hunter's failure to attend the required AA meetings. At the same time, the absence of a written communication does not mutually exclude an oral contact being made by the ECCRP. CAF.

On May 11, 2008, Mr. Hunter completed level one of the CRP and received a certificate of completion. There are no issues noted for Mr. Hunter throughout the rest of 2008.

On February 23, 2009, a DHR worker called the ECCRP to inform it that Mr. Hunter had a positive drug test. The contact logs note that the "case worker will instruct [Mr. Hunter] to report." It also notes that Mr. Hunter was supposed to report on February 27, 2009. However, there is no written indication that Mr. Hunter was made aware of this deadline to report. At the same time, the absence of a written communication does not mutually exclude an oral contact being made by the ECCRP. CAF.

On March 2, 2009, the ECCRP issued a return to court form notifying the AMC that Mr. Hunter had failed to report for required monitoring sessions in January and February. The form also requested that a warrant be issued for Mr. Hunter's arrest. However, there is no written indication in the ECCRP contact logs that Mr. Hunter was scheduled for a monitoring session or that he failed to attend a monitoring session.

On March 8, 2009, the AMC issued a Notice To Show Cause for Failure To Attend the CRP and set a court date for March 19, 2009. On March 19, 2009, the AMC ordered Mr. Hunter to re-enroll in the CRP. The ECCRP notes that Mr. Hunter

was supposed to "return to complete CRO," however the AMC records actually do not order Mr. Hunter to "complete" the CRP, just re-enroll.

Because Mr. Hunter was sentenced on March 29, 2007, he maintains that the two-year statutory maximum period for probation, suspended sentence, and/or the CRP should have expired on March 29, 2009. There is no AMC written record indicating that his probation was revoked or that his probationary period was tolled for any reason. At the same time, the record lacks any evidence of a written order from the AMC indicating that Mr. Hunter's obligation to complete the CRP was no longer a condition of his suspended sentence for his AMC misdemeanor case. CAF. Mr. Hunter continued to be subjected to the CRP requirements beyond March 29, 2009.

On March 30, 2009, the ECCRP noted in the contact logs that, if Mr. Hunter did not report in by March 31, 2009, he would be terminated. Although the AMC did order Mr. Hunter to re-enroll in the CRP, there is no written record from the AMC reflecting a deadline by which to do so. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. Also, there is no written evidence confirming that Mr. Hunter was made aware of the March 31, 2009, deadline. At the same time, the absence of a written communication does not mutually exclude an oral contact being made by the ECCRP. CAF.

On April 1, 2009, the ECCRP issued a return to court form notifying the AMC that Mr. Hunter had failed to make contact and re-enter the CRP. The form also requested that a warrant for his arrest be issued. On the same day, the ECCRP changed Mr. Hunter's status to "terminated." Also on April 1, 2009, the AMC issued a Notice To Show Cause for Failure To Attend the CRP and set a court date for April 23, 2009.

On April 23, 2009, the AMC found Mr. Hunter in "Contempt/CRO" and ordered him to 60 "mandatory days" in jail. His original release date was set for June 21, 2009. However, that release date was struck through and a release date of May 1, 2009, was given with a new court date of June 4, 2009.

On May 1, 2009, a phone call is noted in MIDAS that Mr. Hunter was told to report on May 4, 2009, and sign back up with the CRP. There is no written order from the AMC ordering Mr. Hunter to re-enroll with the CRP upon his release from jail. At the same time, the record lacks any evidence of a written order from the AMC indicating that Mr. Hunter's obligation to complete the CRP was no longer a condition of his suspended sentence for his misdemeanor case. CAF. On May 11, 2009, a phone call is noted in MIDAS that Mr. Hunter was told to report by 4:00 p.m. that day or he would be terminated.

On May 13, 2009, the ECCRP issued a return to court form notifying the AMC

that Mr. Hunter had failed to re-enroll with the CRP as instructed by the AMC on May 1, 2009. There is no written record of the AMC ordering Mr. Hunter to re-enroll with the CRP on that date. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF.

On June 4, 2009, the AMC ordered Mr. Hunter to re-enroll in the CRP and indicated that he would get "jail next time." The AMC also set him for a CRP review on December 10, 2009. The ECCRP notes in its contact logs that Mr. Hunter was given a 5-day suspended sentence, ordered to re-enroll in the CRP, and told to report by June 5, 2009. On June 5, 2009, Mr Hunter reported to the ECCRP and was scheduled for a new evaluation. It was noted that "when [Mr. Hunter] completes meetings, will complete him then per [court]."

On June 22, 2009, Mr. Hunter was called and scheduled for a new evaluation on July 8, 2009. He was told to bring $80 on that date.

On July 8, 2009, the ECCRP called Mr. Hunter and got two wrong telephone numbers. On July 9, 2009, Mr. Hunter reported to the ECCRP for an evaluation. He was screened for drugs and tested positive. Mr. Hunter was given a new evaluation and signed a new case management plan. This new plan gave him a "goal date" of August 27, 2010–more than a year away–for completing the CRP.

On July 31, 2009, August 4, 2009, and August 11, 2009, Mr. Hunter was a

no-show for color-code screening. On August 11, 2009, Mr. Hunter was terminated from the CRP. There is no written evidence indicating that Mr. Hunter was given notice that he was about to be terminated from the CRP.

On August 12, 2009, the ECCRP issued a return to court form notifying the AMC that Mr. Hunter had failed to report for three color-code drug tests. On August 19, 2009, the AMC issued a Notice To Show Cause for Failure To Attend the CRP and set a court date for September 24, 2009. On September 24, 2009, the AMC noted to issue an alias writ. However, the AMC entered a note the next day to hold off on issuing the alias writ until October 8, 2009, as Mr. Hunter had contacted the AMC with an explanation that he had missed his court date because he was injured at work and was in the emergency room.

On October 8, 2009, the AMC ordered Mr. Hunter to re-enroll in the CRP. The ECCRP notes that Mr. Hunter was ordered to re-enroll in the CRP and was supposed to report by October 13, 2009. There is no written record from the AMC imposing a deadline on Mr. Hunter by which to report to the ECCRP and re-enroll. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF.

On October 19, 2009, the ECCRP noted that Mr. Hunter had not called or reported in and terminated him from the CRP. Again, there is no written order from

the AMC making Mr. Hunter aware of any deadline by which he was supposed to report to the ECCRP and re-enroll in the CRP. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. There also is no written evidence indicating that he was notified of his imminent termination from the CRP.

On October 19, 2009, the ECCRP issued a return to court form notifying the AMC that Mr. Hunter had failed to re-enroll in the CRP. On October 21, 2009, the AMC issued a Notice To Show Cause for Failure To Attend the CRP and set a court date for November 19, 2009. Mr. Hunter missed the show cause setting. CAF.

Subsequently, a complaint was filed against him for Failure To Appear in Court on November 19, 2009. That complaint was signed by the City. On January 11, 2010, an Alias Warrant of Arrest for Failure of Defendant To Appear was issued by a magistrate. Both the warrant and the complaint signed by the City have corresponding warrant numbers. On February 19, 2010, Mr. Hunter was arrested on the Failure To Appear. The arrest record references the same warrant number that the complaint signed by the City and the Alias Warrant contain.

Mr. Hunter's arrest for Failure To Appear led to a new charge and case number. (MC10-0083). He was found guilty of Failure To Appear on March 25, 2010, and was ordered to re-enroll in the CRP. He was also set for a CRP review on September 23,

2010.

On March 31, 2010, Mr. Hunter was called and informed to report to the CRP by April 5, 2010. There is no written record that confirms that this was a deadline set by the AMC. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF.

On April 5, 2010, Mr. Hunter reported to the ECCRP, he was color-coded and the ECCRP noted that he still needed 156 self-help meetings. On April 7, 2010, Mr. Hunter had a positive color-code drug test. The ECCRP noted that he owed $60 in monitoring fees plus drug-testing and late fees by April 9, 2010.

On April 14, 2010, April 23, 2010 and May 11, 2010, Mr. Hunter did not report in for color-code drug tests. On May 11, 2010, the ECCRP terminated him. There is no written evidence indicating that Mr. Hunter was made aware that termination was imminent prior to actually being terminated.

On May 12, 2010, the ECCRP issued a return to court form notifying the AMC that Mr. Hunter had failed to report for three color-code drug tests. The form also requested that a warrant be issued for his arrest. Also on May 12, 2010, the AMC issued a Notice To Show Cause for Failure To Attend the CRP and set a court date for June 10, 2010.

On June 10, 2010, the ECCRP noted that Mr. Hunter did not appear for his

scheduled court date. On June 14, 2010, the AMC issued a new Notice To Show Cause for Failure To Attend the CRP and set a court date for June 24, 2010.

On June 24, 2010, Mr. Hunter was found in "Contempt/CRO" and given a "mandatory" 120 days in jail. He was further required to re-enroll in the CRP upon his release from jail. His release date was set on October 28, 2010.

On July 29, 2010, the AMC noted that Mr. Hunter was released from jail after serving 35 of his 120 days for contempt. A CRP review was set for September 23, 2010. Mr. Hunter hired attorney Danny Bone who spoke with the AMC judge and got Mr. Hunter released from jail early.

On July 29, 2010, the ECCRP noted that Mr. Hunter had been released from jail and if he did not report to it by August 6, 2010, he would be terminated. There is no written record from the AMC setting this deadline for Mr. Hunter to report to the ECCRP. At the same time, the absence of a written order does not mutually exclude an oral order by the AMC. CAF. There also is no written evidence indicating that Mr. Hunter was made aware of this deadline by which he must report in or be terminated.

On August 6, 2010, Mr. Hunter was terminated from the CRP. The ECCRP noted that a printed return to court form was issued but a copy of it does not appear in the records produced. Mr. Hunter's termination is not reflected in the ECCRP call log either.

On August 9, 2010, Mr. Hunter reported to the ECCRP. At this time, he was placed back on color-code screening and an evaluation was scheduled for August 24, 2010. Mr. Hunter made payments for drug-testing and rescheduling fees at this time as well. Mr. Hunter had previously been terminated on August 6, 2010, and there is no written order from the AMC to re-enroll after that termination. At the same time, the record lacks any evidence of a written order from the AMC indicating that Mr. Hunter's obligation to complete the CRP was no longer a condition of his suspended sentence for his misdemeanor cases. CAF.

On August 12, 2010, Mr. Hunter did not report for a color-code drug test. The ECCRP noted that he had "one more chance." There is no written evidence indicating that Mr. Hunter was made aware that he only had "one more chance." On August 24, 2010, Mr. Hunter reported to the ECCRP and his evaluation was rescheduled for September 9, 2010.

On September 7, 2010, Mr. Hunter failed to report for a color-code drug test. The ECCRP noted that he would be terminated when he did not show up for his evaluation. There is no written evidence indicating that Mr. Hunter was notified of his imminent termination.

On September 20, 2010, Mr. Hunter failed to report for a color-code drug test and was terminated. On the same day, the ECCRP issued a return to court form

notifying the AMC that Mr. Hunter had failed to report for two evaluations and three color-code drug tests.

On September 23, 2010, Mr. Hunter was set for a CRP review but failed to show up. On October 18, 2010, the AMC issued a Notice To Show Cause for Failure To Attend the CR[P] and set a court date for November 4, 2010. Mr. Hunter failed to appear for his scheduled court date. A complaint was filed against Mr. Hunter for Failure To Appear in Court on November 4, 2010. That complaint was signed by the City.

On November 29, 2010, an Alias Warrant for Arrest for Failure of Defendant To Appear was issued by a magistrate. Both the warrant and the complaint signed by the City have corresponding warrant numbers. On August 20, 2011, Mr. Hunter was arrested on the Failure To Appear. The arrest record references a warrant issued on the same date as the Alias Warrant above dated November 29, 2010.

Mr. Hunter's second arrest for Failure To Appear led to a new charge and case number (MC11-0646). Mr. Hunter hired attorney Eddy Cunningham to represent him on this third misdemeanor case. Apparently, Mr. Hunter failed to appear in court on September 22, 2011, because on October 12, 2011, a complaint was filed against him for Failure To Appear in Court on September 22, 2011. The complaint is signed by the City.

On October 12, 2011, an Alias Warrant of Arrest for Failure of Defendant To Appear was issued by a magistrate. Both the complaint and the warrant reference the same warrant number. The Alias Warrant was cleared by Ramos on May 4, 2012, and recalled on May 7, 2012. The underlying case for which this warrant was issued, the Failure To Appear in MC11-0646, was dismissed on July 12, 2012.

On May 5, 2015, Mr. Hunter's misdemeanor case(s) and obligation to complete the CRP were closed. Mr. Hunter was sentenced in his first misdemeanor case on March 29, 2007. Mr. Hunter was sentenced in his second misdemeanor case on March 25, 2010.

Mr. Hunter claims that the statutory maximum period for probation, the suspended sentence, and/or completing the CRP should have expired on March 29, 2009. Mr. Hunter continued to be subjected to ECCRP requirements until May 5, 2015, when his misdemeanor case(s) were closed. After March 29, 2009, Mr. Hunter was scheduled for at least one evaluation, called by the ECCRP at least three times, required to report to the ECCRP at least three times, color-coded at least twelve times, and returned to court at least six times. Mr. Hunter was also charged drug-testing fees, monitoring fees, and/or late fees at least five times. Mr. Hunter also claims that he was incarcerated for at least forty-three days as a direct result of his failure or inability to comply with the CRP requirements after the statutory maximum

period had expired.

Mr. Hunter had three complaints and warrants sworn out against him by the City that directly stemmed from his inability or failure to comply with the CRP requirements. He was arrested twice as a result of those complaints and warrants, received two new charges and cases against him, and had to hire an attorney to represent him in those matters.

## IV.    PRELIMINARY ISSUES

Before turning to an analysis of the pending motions, the Court will first determine those claims that remain in this severed action.

### Plaintiffs' Relevant Claims

Plaintiffs' third amended and restated complaint has 21 separate counts (asserting both federal and state law claims), 359 paragraphs, and 97 pages. (*See generally Brannon*, Doc. 63 (N.D. Ala. Apr. 9, 2015)). Because this case was originally part of the *Brannon* lawsuit, some of the counts included in the operative complaint are beyond the scope of the City's Motion and the ECCRP Defendants' Motion as they relate only to the City of Gadsden, a non-party in this case. The non-applicable counts are Counts Two, Five, Eight, Eleven, Fourteen, and Eighteen. Those counts which remain pertinent here are summarized below:

## <u>Plaintiffs' Constitutional Counts</u>[10]

●     Count One–Denial of Due Process by the ECCRP and/or Ms. Zaner in her Personal Capacity Applicable to All Plaintiffs (*Brannon*, doc. 63 at 39-43 ¶¶ 129-142);[11, 12]

●     Count Three–Denial of Due Process by the City Applicable to Plaintiffs Hunter and Loyd (*id.* at 46-49 ¶¶ 155-166);[13]

●     Count Four–Violation of the Fourth Amendment by ECCRP and/or Ms. Zaner in her Personal Capacity Applicable to All Plaintiffs (*id.* at 49-52 ¶¶ 167-178);

---

[10] Plaintiffs claim proximately-caused damages in the last paragraph of each constitutional count:

> [L]oss of liberty and injury to dignity by being arrested, incarcerated, and subjected to additional fines, costs, and ECCRP requirements and fees.

(*Brannon*, Doc. 63 at 43 ¶ 142; *id.* at 61 ¶ 217).

[11] The Court notes that Count One of Plaintiffs' third amended and restated complaint contains a misplaced reference to Plaintiffs' due process rights guaranteed by the Fifth Amendment. (*Brannon*, Doc. 63 at 40 ¶ 130). The Fifth Amendment prohibits due process violations by the federal government and, therefore, cannot apply here as a matter of law.

[12] As this Court explained earlier in the litigation, any federal claims brought against Ms. Zaner in her official capacity are duplicative of those claims brought against the ECCRP. *See, e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("In contrast to individual capacity suits, when an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." (footnote and internal quotation marks omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))); *Kentucky*, 473 U.S. at 166-67 ("When it comes to defenses to liability [in a § 1983 action], an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law."). Therefore, the § 1983 question that remains for Ms. Zaner is to what extent a triable issue exists regarding her personal liability to Plaintiffs for allegedly violating their Fourteenth and Eighth Amendment rights.

[13] The Court notes that Count Three of Plaintiffs' third amended and restated complaint contains a misplaced reference to Plaintiffs' due process rights guaranteed by the Fifth Amendment. (*Brannon*, Doc. 63 at 46 ¶ 156). The Fifth Amendment prohibits due process violations by the federal government and, therefore, cannot apply here as a matter of law.

- Count Six–Violation of the Fourth Amendment by the City Applicable to Plaintiffs Hunter and Loyd (*id.* at 55-58 ¶¶ 191-201);

- Count Seven–Violation of the Eighth Amendment by the ECCRP and/or Ms. Zaner in her Personal Capacity Applicable to All Plaintiffs (*id.* at 58-61 ¶¶ 202-217);

- Count Nine–Violation of the Eighth Amendment by the City Applicable to Plaintiffs Hunter and Loyd (*id.* at 65-68 ¶¶ 232-245);

- Count Ten–Denial of Equal Protection by the ECCRP and/or Ms. Zaner in her Personal Capacity Applicable to All Plaintiffs (*id.* at 68-73 ¶¶ 246-263); and

- Count Twelve–Denial of Equal Protection by the City Applicable to Plaintiffs Hunter and Loyd (*id.* at 77-80 ¶¶ 279-293).

### Plaintiffs' Alabama Common-Law Counts

- Count Thirteen–False Imprisonment and False Arrest by ECCRP and/or Ms. Zaner Applicable to All Plaintiffs (*Brannon*, doc. 63 at 80-82 ¶¶ 294-303);

- Count Fifteen–False Imprisonment and False Arrest by the City Applicable to Plaintiffs Hunter and Loyd (*id.* at 84-86 ¶¶ 313-321);

- Count Sixteen–Abuse of Process by ECCRP and/or Ms. Zaner Applicable to All Plaintiffs (*id.* at 86-87 ¶¶ 322-328);

- Count Seventeen–Negligent, Reckless and/or Wanton Training and/or Supervision by the ECCRP and/or Ms. Zaner Applicable to All Plaintiffs (*id.* at 87-88 ¶¶ 329-333); and

- Count Nineteen–Negligent, Reckless and/or Wanton Training and/or Supervision by the City Applicable to Plaintiffs Hunter and Loyd (*id.* at 89-90 ¶¶ 339-343).

Although Counts One, Three, Seven, and Nine are brought pursuant to § 1983,

they also contain fleeting shotgun references to Alabama constitutional law. (*See, e.g.*, *Brannon*, Doc. 63 at 40 ¶ 130 (alleging Alabama due process violations); *id.* at 46 ¶ 156 (same); *id.* at 58-59 ¶ 206 (referencing Ala. Const. Art. I, § 20); *id.* at 66 ¶ 236 (same)). To the extent that Plaintiffs wanted to pursue state constitutional claims against Defendants, they were required to replead them in separate counts. (*See Brannon*, Doc. 40 at 11, 12 (N.D. Ala. Dec. 4, 2013) (pointing out how "Plaintiffs … have confusingly lumped claims arising under federal law with others arising under state law within the same count" and ordering that "Plaintiffs' restated pleading must . . . avoid lumping causes of action together")). Nonetheless, those purported state constitutional claims, asserted in violation of this Court's repleader requirements, fail for other reasons as stated herein.

Plaintiffs' remaining counts include:

- Count Twenty–Declaratory Relief (*Brannon*, doc. 63 at 90-93 ¶¶ 344-351); and

- Count Twenty-One–Injunctive Relief (*id.* at 93-95 ¶¶ 352-359).

## V.  ANALYSIS

### A.  Plaintiffs' Constitutional Claims

#### 1.  Plaintiffs have not carried their burden to show a triable federal or state constitutional claim.

The ECCRP Defendants begin the argument section of their opening brief by

pointing to the absence of proof supporting Plaintiffs' alleged constitutional harms:

> In ruling on ECCRP's Motion to Dismiss the Second Amended Complaint, the Court was required to and did "assume the veracity of well-pleaded factual allegations." At summary judgment, however, the Plaintiffs are required to prove their claims by affirmative, substantial evidence. This is a burden that they cannot meet, and a close examination of the evidentiary record reveals a total lack of factual support for Plaintiff[s'] allegations against ECCRP.

(Doc. 73 at 22-23).[14]

Plaintiffs generally respond that the ECCRP Defendants kept them "on [p]robation and [s]ubjected to the [CRP] [r]equirements [b]eyond the [s]tatutory [m]aximum, [r]esulting in [c]onstitutional [h]arms." (Doc. 83 at 28 (emphasis omitted)). Plaintiffs more specifically maintain as subpoints that the ECCRP Defendants restarted them in the CRP without an order from the AMC and without advising the AMC (doc. 83 at 29-32), imposed graduated sanctions on them without permission from the AMC (*id.* at 32-35), failed to check and report to the AMC their current probationary status (*id.* at 35-37), and failed to send written warnings to them prior to terminating their participation in the CRP. (*Id.* at 37-38).

The City has supplemented its summary judgment materials by joining in the those additional arguments raised by the ECCRP Defendants, including the position that Plaintiffs lack evidence to support a triable constitutional claim. (Docs. 75, 76,

---

[14]  All page references to Doc. 73 correspond with the Court's CM/ECF numbering system.

86). Plaintiffs base the City's constitutional liability upon the AMC's asserted violation of Alabama's two-year maximum probation period in enforcing the CRO and the City's signing of complaint against Plaintiffs after their respective maximum probation periods had expired:

> A municipal court may suspend execution of a sentence and/or place a misdemeanant on probation for a period of time, not to exceed two years. Ala. Code § 12-13-13(a); (g) (1975). "The period of probation or suspension may be continued, extended, or terminated. However, . . . , in no case shall the maximum probation period of a defendant guilty of a misdemeanor exceed two years." Ala. Code § 15-22-54(A) (1975). The requirement to participate in a CR[P] . . . generally comes as a condition of probation or of a suspended sentence. Thus, if a probationary period or suspended sentence cannot, by statute, be extended for more than two years, then neither can CR[P] as a condition of the probation or suspension. . . .
>
> The custom of signing complaints against misdemeanants after the ordered probation/suspension periods or the statutory maximum for those periods resulted in constitutional harm to the Plaintiffs. Yet, the City of Attalla swore out complaints without any regard to the limitations of the city's authority over a misdemeanant. That then resulted in more CR[P] requirements, warrants, arrests, and attorney fees for the Plaintiffs.

(Doc. 80 at 33, 38).

Before evaluating the parties' competing constitutional positions, the Court discusses three Alabama laws that are implicated in this case–Alabama's Mandatory Treatment Act of 1990 (the "AMTA"), Ala. Code §§ 12-23-1–12-23-19, Alabama's Probation Statute (the "APS"), Ala. Code § 15-22-54, and Alabama's Municipal

Court Probation Statute (the "AMCPS"), Ala. Code § 12-14-13.

Ala. Code § 12-23-2 describes AMTA's legislative purpose:

> The Legislature finds that the high incidence of crimes which directly
> involve alcohol and drugs in this state is intolerable; that the problems
> of alcohol and drug abuse among the citizens of Alabama are extensive
> and exist at an unacceptable level; that alcohol and/or drug abuse or
> dependency have been identified as contributing factors in the
> commission of many crimes; that a concentrated and coordinated state
> and local effort is needed to address the needs of Alabamians regarding
> such problems; that a specialized system for screening, evaluating,
> educating, and rehabilitating defendants convicted of alcohol and drug
> related offenses is required to address such problems; and that adequate
> funding should be provided for this purpose. It is therefore the intent of
> the Legislature:
>
> To establish a specialized court referral officer program to promote the
> evaluation, education and rehabilitation of persons whose use or
> dependency on alcohol or drugs directly or indirectly contributed to the
> commission of an offense for which they were convicted in state or
> municipal courts and to establish mandatory alcohol and drug abuse
> treatment programs to provide treatment and rehabilitation for these
> identified offenders.

Ala. Code § 12-23-2 (emphasis added). The ECCRP is a creature of the AMTA. *See*

Ala. Code § 12-23-4(a) (describing role of the Administrative Director of Courts in

approving "individuals or entities to provide alcohol and drug assessment for courts

and to conduct the court referral programs in each court jurisdiction of the state");

Ala. Code § 12-23-4(b) (setting forth duties of court referral officers).

The APS establishes various parameters that apply to probation or suspension

of a criminal sentence. The key provision of the APS at issue in this case is § 15-22-

54(a):

> (a) The period of probation or suspension of execution of sentence shall be determined by the court and shall not be waived by the defendant, and <u>the period of probation or suspension may be continued, extended, or terminated</u>. However, . . . <u>in no case shall the maximum probation period of a defendant guilty of a misdemeanor exceed two years</u>, nor shall the maximum probation period of a defendant guilty of a felony exceed five years. When the conditions of probation or suspension of sentence are fulfilled, <u>the court shall, by order duly entered on its minutes, discharge the defendant</u>.

Ala. Code § 15-22-54(a) (emphasis added).

> The AMCPS provides in full:

> (a) Municipal courts <u>may suspend execution of sentence</u> and place a defendant on probation for varying periods of time, <u>not to exceed two years</u>.

> (b) The court may require such investigations as may be deemed necessary and desirable to be made by a probation officer or such other suitable person or persons as the court may designate as to the circumstances of the offense and the criminal record, social history and present condition of the defendant.

> (c) The court may suspend the execution of sentence and continue the defendant under an existing bond or may require such additional bail as it deems necessary pending the disposition of the application for probation.

> (d) The court shall determine and may, at any time, modify the conditions of probation and may require the probationer to comply with the following or any other conditions:

>> (1) To avoid injurious or vicious habits;

>> (2) To avoid persons or places of disreputable or harmful

character;

(3) To report to the probation officer or other person designated by the judge;

(4) To permit the officer to visit him at his home or elsewhere;

(5) To work faithfully at suitable employment as far as possible;

(6) To remain within a specified area;

(7) To pay the fine and costs imposed or such portions thereof as the judge may determine and in such installments as the judge may direct;

(8) To make reparation or restitution to any aggrieved party for the damage or loss caused by his offense in an amount to be determined by the court; and

(9) To attend defensive driving schools, alcohol countermeasure programs or courses where available and support his dependents to the best of his ability.

(e) The probation or other officer designated by the court shall investigate all cases when directed to do so by the court and report in writing thereon if the court so directs. The officer, if so designated, shall furnish to each probationer released on probation under his supervision a written statement of the conditions of probation and shall instruct the probationer regarding the same. Such officer shall keep informed concerning the conduct and conditions of each person on probation under his supervision by visiting the probationer and requiring reports from the probationer or others and shall report thereon in writing as often as the court may require. Such officer shall use all practicable and suitable methods, not inconsistent with the conditions imposed by the court, to aid and encourage persons on probation and to bring about improvement in their conduct and condition. Such officer shall keep

detailed records of his work and shall make such reports in writing as the court may require. The officer so designated shall have, in the execution of his duties, the power to arrest probationers and the same right to execute process as is given by law to peace officers.

(f) All reports, records and data assembled by any probation officer and referred to the court shall be privileged and shall not be available for public inspection except upon order of the court to which the same was referred. All probation reports completed and filed shall be subject to inspection by the defendant or his attorney.

g) <u>The period of probation or suspension of execution of sentence shall be determined by the court and may exceed the length of the sentence, and such period may be extended a period of two years from date of sentencing</u>.

(h) <u>Upon the satisfactory fulfillment of the conditions of probation or suspension of sentence, the court shall, by order duly entered on the minutes, discharge the defendant</u>.

(i) At any time during the period of probation or suspension of execution of sentence, <u>the court may issue a warrant and cause the defendant to be arrested for violating any of the conditions of probation or suspension of sentence</u>. Any probation officer with probable cause to believe a probationer has violated the conditions of probation may arrest such probationer without a warrant. In case of an arrest without a warrant, the probation officer shall prepare a written statement setting forth that the probationer has, in his judgment, violated the conditions of probation, and said statement shall be sufficient warrant for having probationers brought forthwith before the court for determination as to probable cause for the charge of probation violation. The court may order detention of the probationer pending further hearing, after which the court may revoke the probation or suspension of sentence and order and adjudge that the sentence be immediately executed.

Ala. Code § 12-14-13 (emphasis added).

Against this backdrop, Plaintiffs primarily premise their constitutional claims

on the theory that Defendants have violated Alabama law by requiring them to remain subject to the CRP's requirements beyond the two-year maximum period applicable to suspended sentences for misdemeanor violations. However, Plaintiffs have not offered any federal or Alabama case authority to support this argument of Defendants' alleged constitutional liability pursuant to this overarching proposition. Instead, this section of Plaintiffs' brief (doc. 83) points to provisions of the AMTA and the Alabama Administrative Office of Courts Court Referral Officer Field Manual (the "CROFM") as the legal grounds for establishing constitutional liability. (*See id.* at 28 (citing the AMTA and the CROFM as recognizing that "[t]he courts are to supervise ECCRP and approve or give permission for ECCRP's actions")).

Concerning the ECCRP Defendants' purported constitutional liability, Plaintiffs cite to various parts of the CROFM in an effort to show that Defendants failed to comply with it and likewise failed to communicate adequately with the AMC about Plaintiffs' status under the CRP. One form that Plaintiffs identify is the Order To Complete ("OTC"). (Doc. 83 at 31); (*see also* Doc. 69-4 at 36, 97, 138-140).[15] Plaintiffs point out that the record does not reflect that the ECCRP Defendants provided the AMC with OTC forms. (Doc. 83 at 31).

Plaintiffs also complain that the ECCRP Defendants did not provide the AMC

---

[15] All page references to Doc. 69-4 correspond with the Court's CM/ECF numbering system.

with any case management plan(s) for them. (*Id.* at 32). Plaintiffs further fault the ECCRP Defendants for giving them graduated sanctions (due to their relapses) without the permission of the AMC. (Doc. 83 at 33-35); (*see also* Doc. 69-4 at 50 ("If a relapse does occur, it is [CRP] policy that graduated sanctions be employed with the court's permission.")).

Plaintiffs additionally maintain that the ECCRP Defendants violated their CROFM because they did not provide them with written notices of non-compliance before issuing a return to court form. (Doc. 83 at 37-38); (*see also* Doc. 69-4 at 85 ("Defendants should receive at least two written notices or warnings advising of possible termination for failure to comply with the court's order before they are returned to court." (emphasis added))).

Plaintiffs also argue that the ECCRP failed to check on their "current probationary status" (doc. 83 at 36); (*see also* Doc. 69-4 at 47 (same)). Then citing to the AMTA's requirement that court referral officers report "appropriate evaluative measures to the court," Plaintiffs suggest that the ECCRP had a duty to keep track of Plaintiffs' statutory maximum date, but "never made an attempt to [do so.]" (Doc. 83 at 36). Plaintiffs further urge that the ECCRP Defendants "had no excuse for not knowing when the court ordered probation period ended." (*Id.* at 37). However, Plaintiffs fail to point to any provision of the CROFM which expressly requires the

ECCRP Defendants to calculate the maximum probation period and/or verify the maximum time remaining on a criminal defendant's probation term. Further, the ECCRP Defendants' obligation to confirm the "status designation (juvenile, youthful offender, other)" (doc. 69-4 at 46) of a probationer, is not the equivalent of a duty to track that person's maximum probation period. Nor does the CROFM language requiring the ECCRP Defendants to check the status of a probationer straightforwardly signify such a duty. (*Cf. id.* at 18 § II.E ("Reviews sentence and probation requirements with a defendant and monitors participants for compliance, providing follow-up support as necessary."); *id.* at 46-47 § 5.a-c ("Check legal status [including] . . . [c]urrent probationary status[.]")).

In fact, at the end of the "**MONITORING PROCEDURE**" section, the CROFM states:

> Once the defendant has successfully completed all monitoring sessions, a certificate of completion should be issued, and the court should be formally notified of completion. The court copy (canary) of the OTC [Order To Complete] or a copy of the certificate of completion may be used as the formal notification of successfully completing the Court Referral Program.

(Doc. 69-4 at 47). Thus, the CROFM makes no reference to any requirement that completion of the CRP must occur within a probationer's maximum probation period.

Likewise, when Ms. Zaner was asked during her deposition if she had "any responsibility to monitor the length of time that someone is – one of your clients,

municipal court defendants, is involved in probation?" (doc. 70-1 at 20 at 79),[16] she

responded, "I don't know how I could properly monitor that." *Id.* Ms. Zaner also

stated, "I'm assuming it's the same for everyone <u>unless you take into account the</u>

<u>tolling period</u>. I mean, I don't know about all that." (*Id.* at 80 (emphasis added)); *see*

*also id.* (Ms. Zaner's stating that "I don't think I'm qualified [to make that

calculation].")). Thus, neither the CROFM nor Ms. Zaner's testimony establishes that

the ECCRP Defendants disregarded an express duty to track a probationer's

maximum probation period.

Further, the Court has been unable to locate where the AMTA imposes such

an express obligation on court referral officers. Section 12-23-7 of the AMTA

mentions probation, but does not mandate that court referral officers keep track of a

defendant's maximum probation term. Thus, Plaintiffs have failed to establish that the

ECCRP Defendants had a duty to track Plaintiffs' maximum probation periods under

Alabama law.

Moreover, it is far from clear that a misdemeanant's compliance with the

AMTA is subject to a two-year limitation. In the fact section of their brief, Plaintiffs

cite to ALA. R. CRIM. P. 26.3(a) in an effort to dispute "that the state of Alabama has

---

[16] The first page references to Doc. 70-1 correspond with the Court's CM/ECF numbering system.

never taken a position that the maximum period of time that a person can be enrolled in a court referral program is limited to two years for any reason." (Doc. 83 at 6 ¶ 188). This Alabama criminal rule of procedure governs presentence reports and makes no mention of calculating probation terms. Instead, the non-felony subpart states only that "[t]he court may require a presentence report in all cases in which it has either discretion over the penalty to be imposed or authority to suspend execution of the sentence." ALA. R. CRIM. P. 26.3(a)(1). Plaintiffs make no effort to explain how this non-substantive rule establishes the unlawfulness of Defendants' conduct under state (or federal) law.

Plaintiffs also refer to 12-14-13(a), (g) of the AMCPS as establishing a two-year maximum period of time in which a misdemeanant can be subject to the AMTA. As set out above, the AMCPS (like the APS) has a two-year limitation. However, the AMTA has no such temporal restriction. Thus, the still unanswered question under Alabama law is whether the AMTA should be construed to contain an implicit cutoff of two years.

However, even when accepting that the AMTA (or another statute) makes the ECCRP Defendants responsible for ensuring compliance with the maximum probation term or that the ECCRP Defendants violated provisions of the CROFM with respect to Plaintiffs' misdemeanor cases, Plaintiffs still have not demonstrated

why that matters from a federal (or state) constitutional standpoint. Likewise, accepting that the AMC failed to properly track Plaintiffs' maximum probation periods and improperly extended their participation in the CRP beyond the two-year cutoff, Plaintiffs still have not demonstrated why a reasonable jury could conclude that the City violated Plaintiffs' federal or state constitutional rights because of that evidence.[17]

Concerning Plaintiffs' federal constitutional claims more specifically, "[t]o obtain relief under 42 U.S.C. § 1983, [Plaintiffs] must show (1) that [Defendants] deprived [them] of a right <u>secured under the Constitution or federal law</u> and (2) that the deprivation occurred under color of state law."[18] *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993) (emphasis added) (citing *Sims v. Jefferson*

---

[17] Plaintiffs' theory of constitutional liability against the City is premised upon the "failures of behalf of the [AMC] to perform its administrative function of properly supervising [the] ECCRP [which] allowed [the] ECCRP to continue the acts or omissions that ultimately caused the harms and deprivations suffered by the Plaintiffs." (Doc. 80 at 44).

[18] Concerning the ECCRP Defendants more specifically, Plaintiffs claim that the nexus/joint action test (through the ECCRP Defendants' relationship with the AMTA and the Administrative Office of Courts) provides the necessary state-actor link for § 1983. (*See* Doc. 83 at 39 (citing *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837 (11th Cir. 1993)); *see also Willis*, 993 F.2d at 840 ("The nexus/joint action test applies where 'the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" (quoting *National Broadcasting Co., Inc. v. Communications Workers of America, AFL–CIO*, 860 F.2d 1022, 1026-27 (11th Cir. 1988))). Defendants (who are private parties) have not contested the presence of cognizable state action pursuant to § 1983 under this test. (*See generally* Doc. 89 (mentioning nothing about Plaintiffs' inability to show state action in the ECCRP Defendants' reply)); *see also Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982))).

*Downs Racing Assoc., Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985)). Here, Plaintiffs' briefs have made little to no effort to explain how Defendants' actions (or inactions) implicate a federal or state constitutional right <u>in a triable manner</u>.

For example, in opposition to the ECCRP Defendants' Motion, Plaintiffs vaguely refer to "[c]onstitutional [h]arms" (doc. 83 at 28 (emphasis omitted)); "[c]onstitutional [v]iolations" (*id.* at 38 (emphasis omitted)); (*id.* at 41, 45); "constitutional right[(s)]" (*id.* at 39, 42, 52, 57 ); "unconstitutional conduct" (*id.* at 41, 42); (*id.* at 45 (italics omitted)); (*id.* at 50 (italics omitted)); "constitutional deprivation[(s)]" (*id.* at 41, 42, 45); "unconstitutional acts" (*id.* at 60); "constitutional liberty and property violations beyond the ordered probation and the statutory maximum periods" (*id.* at 61); and "continuing constitutional and state-law injuries" (*id.* at 63). However, nowhere in their brief do they discuss <u>in any detail</u> how their evidence establishes a triable due process, equal protection, unlawful deprivation or seizure, cruel and unusual punishment, Fourteenth Amendment, Fourth Amendment, or Eighth Amendment constitutional claim. (*See generally* Doc. 83).

Similarly, in opposition to the City's Motion, Plaintiffs vaguely mention "unconstitutional acts" (doc. 80 at 27); "constitutional liberty and property violations beyond the ordered probation and the statutory maximum periods" (*id.* at 29); ("continuing constitutional and state-law injuries") (*id.* at 31); "[c]onstitutional

[h]arms" (*id.* at 32 (emphasis omitted)); ("constitutional injury") (*id.* at 33, 38); and "constitutional harm" (*id.* at 38). Quoting from the "PRIVATE PROBATION" section of the Ala. Judicial Inquiry Comm'n, Advisory Op. No. 14 (Mar. 4, 2014), Plaintiffs also indicate that "all actions regarding probation be subject to review by the [municipal] judge to ensure <u>that such actions do not violate an offender's rights of due process or equal protection of the law</u>." *Id.* at 4 (emphasis added). However, nowhere in their brief do Plaintiffs discuss <u>in any detail</u> how their evidence establishes a triable due process, equal protection, unlawful deprivation or seizure, cruel and unusual punishment, Fourteenth Amendment, Fourth Amendment, or Eighth Amendment constitutional claim. (*See generally* Doc. 80).

Thus, even accepting as true that the ECCRP Defendants violated a duty to track Plaintiffs' probation terms and/or report that information to the AMC or that they violated various provisions of the CROFM, the Court nevertheless finds that Plaintiffs' attempt to show a triable federal or state constitutional claim fails. Similarly, if Plaintiffs are correct that the AMC violated a duty to track Plaintiffs' probation periods and/or to limit Plaintiffs' time subject to the CRP to two years from the original sentence date, the Court nevertheless finds that Plaintiffs' attempt to show a triable constitutional claims against the City (for the AMC's omission) fails.

More specifically, in the absence of referencing a single federal or state

constitutional case factually comparable to theirs in which a constitutional right was recognized, or at least listing what elements support any of their purported constitutional claims along with identifying any corresponding proof that a reasonable jury could consider, Plaintiffs' constitutional claims are all fatally underdeveloped. *Cf. Flanigan's Enters., Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument), *superceded on other grounds by county ordinance as stated in Buehrle v. City of Key W.*, 813 F.3d 973, 980 n.3 (11th Cir. 2015); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

As the Court observed during the pleadings stage:

> In redrafting, the court encourages Plaintiffs to refer to pattern jury charges as a way to streamline their allegations and reduce the scope of their currently cumbersome complaint into a more manageable and plausible pleading. Plaintiffs are **HEREBY CAUTIONED** that their failure to replead in a concise and meaningful manner may result in the dismissal of one or more of their claims with or without prejudice.

(*Brannon*, Doc. 62 at 37 (N.D. Ala. Mar. 10, 2015) (emphasis by underlining added)).

Despite the Court's early instruction to focus on fundamentals before this action was severed from *Brannon*, Plaintiffs' oppositions still lack legal clarity as to why their facts present a federal (or state) constitutional case against the ECCRP Defendants

<u>or the City</u>. In fact, reading Plaintiffs' briefs reminds this Court of the first two lines of Buffalo Springfield's "For What It's Worth": "There's something happening here[.] But what it is ain't exactly clear[.]"[19]

When a defendant argues that a claim is factually and/or legally insufficient on summary judgment, it is the plaintiff's job, as the non-movant, to make it clear to the Court why a <u>triable</u> claim does, in fact, exist. Scrutiny through a Rule 56 lens typically demands much more from a plaintiff than a showing of Rule 12(b)(6) plausibility; an unclearly developed claim is <u>not</u> a triable one. Here, Plaintiffs' nebulous efforts do not satisfy their Rule 56 burden to show how their facts, if proven to a jury, constitute a cognizable constitutional claim under either federal or state law against any Defendant. Accordingly, summary judgment is due to be granted as Counts One, Three, Four, Six, Seven, Nine, Ten, and Twelve in light of Plaintiffs' failure to carry their burden as the non-movants.

**2. Plaintiffs' constitutional claims also fail because they have not demonstrated that their probation terms violated state law.**

According to Plaintiffs, the overall key to Defendants' liability is that Plaintiffs were subject to non-custodial supervision through the CRP for longer than the two-year statutory maximum as provided for by the APS and the AMCPS. (Doc. 83 at 35);

---

[19] *See* https://www.azlyrics.com/lyrics/buffalospringfield/forwhatitsworth.html.

(Doc. 80 at 33, 38). Although Plaintiffs have not pointed to any case authority that supports any of their constitutional theories, the Court has located a few cases that shed some light as it pertains to their Fourteenth Amendment count.

"The Fourteenth Amendment provides that '[n]o State shall ... deprive any person of life, liberty, or property, <u>without due process of law</u>; nor deny to any person within its jurisdiction the equal protection of the laws.'" *Holt v. Glenn*, 361 F. App'x 75, 77 (11th Cir. 2010) (emphasis added) (quoting U.S. Const., Amend. XIV § 1). In *United States v. Cornwell*, 625 F.2d 686 (5th Cir. 1980),[20] a probationer "assert[ed] that the court's extension of his probation period, without notice or a hearing, constitute[d] a denial of due process." *Id.* at 687. As legal support, the probationer relied upon *Gagnon v. Scarpelli*, 411 U.S. 778 (1973). *Id.* The Supreme Court ruled in *Gagnon* that "a probationer is entitled to notice and a hearing when a petition is filed to revoke his probation." *Cornwell*, 625 F.2d at 687 (citing *Gagnon*, 411 U.S. at 782).

As the *Cornwell* court explained the Supreme Court's reasoning in *Gagnon*:

> The Supreme Court, in requiring hearings in connection with probation revocations, relied upon its earlier decision in *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). In that case, the Court held that the due process clause requires that an

---

[20]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

individual on parole be afforded a hearing before his parole is revoked. In determining whether the nature of the parolee's interest was within the Fourteenth Amendment protection of liberty or property, the court stated:

> The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.

> We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others. (footnotes omitted.)

*Id.* at 482, 92 S. Ct. at 2600. Subsequently, in *Gagnon v. Scarpelli*, *supra*, the Court held that the same guarantee of due process applies to revocations of probation, since revocation of probation results in the same loss of liberty.

*Cornwell*, 625 F.2d at 688.

The *Cornwell* court further explained that "[t]he Supreme Court has not considered whether due process requires that an individual on probation be afforded

an opportunity to be heard when his probation is extended[.]" *Id.* After discussing the decisions by the Third and Eighth Circuits that "rejected claims of a due process right to a hearing in probation extensions[,]" the former Fifth Circuit held "that extension of a 'non-custodial period of supervision to a term <u>within the statutory limits</u> [does not] implicate a liberty interest sufficient to require a preextension hearing as a constitutionally commanded right.'" *Id.* (emphasis added) (quoting *United States v. Carey*, 565 F.2d 545, 547 (8th Cir. 1977)); *Cornwell*, 625 F.2d at 688 ("The nature of the interest and the loss resulting from extension simply do not parallel the fundamental nature of the interest or the seriousness of the loss involved in *Morrissey* and *Gagnon*.").[21]

An arguably implicit holding of *Cornwell* is that an extension of a non-custodial period of supervision to a term <u>beyond</u> the statutory limits does (at least potentially) implicate a cognizable federal liberty interest. *Cf. also Ray v. Judicial Correction Services*, No. 2:12-CV-2819-RDP, Doc. 626 at 62 (N.D. Ala. Sept. 12, 2017) (concluding, based upon and *Cornwell* and *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647 (2d. Cir. 1993), that "a reasonable jury could find that JCS unconstitutionally extended Plaintiffs' . . . probation sentences beyond the

---

[21] Although the *Cornwell* court found no due process violation, it nevertheless held "that district courts shall hereafter provide notice to probationers of proposed extensions and advise probationers that they have a right to a hearing before the court acts." 625 F.2d at 689.

statutory maximum <u>without providing any notice</u> to Plaintiffs of the extension or any opportunity for a hearing") (emphasis added).[22] However, it is significant that the potentially unconstitutional act in these cases is <u>not</u> the extension of probation; rather, it is the <u>lack of notice</u> prior to such extension.

Therefore, at least as it pertains to their Fourteenth Amendment count, Plaintiffs may have a viable due process claim if they can show that their non-custodial period of supervision by Defendants cannot legally exceed two years under the AMTA (by reconciling it with the APS and the AMCPS) and that a reasonable jury could conclude that Defendants' supervision of them under the CRP did, in fact, exceed that time period <u>without any notice or an opportunity to be heard</u>.

As to the first issue, Defendants point out that no court has held that a criminal defendant's compliance with the AMTA is subject to a two-year limitation like other conditions of probation. Plaintiffs do not deal with this point directly. Rather, they proceed as if a two-year limitation on compliance with the AMTA is an express statutory provision (which it is not). Nonetheless, even if this Court assumes that the

---

[22] The scope of services provided by JCS as described in the *Ray* case is much broader than the duties of Defendants here. More specifically, "JCS conducted many administrative and judicial functions of the municipal court" (*Ray*, doc. 626 at 4 (internal quotation marks omitted)), and allegedly violated due process rights by "the imposition of term of probation exceeding two years[.]" (*Id.* at 5). Additionally, the most current operative complaint in *Ray* does not reference the AMTA as an underlying statute applicable to those plaintiffs' claims. (*See generally Ray*, Doc. 305 (Plaintiffs' Fourth Amended and Restated Complaint) (N.D. Ala. Feb. 1, 2016)).

AMTA must be read in conjunction with the APS and the AMCPS and is, consequently, subject to a two-year limitation, Plaintiffs' Fourteenth Amendment due process claim (and also any other arguable constitutional right tied to that line of reasoning) still fails.

In *Owens v. State*, 728 So. 2d 673 (Ala. Crim. App. 1998), a probationer filed a habeas petition that challenged "the district court's revocation of his probation" on the basis of the APS's two-year limitation. *Id.* at 674, 675. The probationer's criminal court history in *Owens* is strikingly comparable to those of Plaintiffs. The probationer had pled guilty to a misdemeanor offense on July 22, 1993, and "[h]e was sentenced to 12 months' imprisonment for each conviction, the sentences to run consecutively." *Id.* "The district court suspended the sentences, and placed the appellant on two years' probation on the condition that he pay fines, costs, remuneration to the Crime Victims Compensation Fund, and restitution, and that he attend a school for offenders who have negotiated worthless instruments ("NWNI School")." *Id.* "The district court ordered the appellant to begin making payments on September 1, 1993." *Id.*

Subsequently, the district court determined that the probationer was not in compliance with the terms of his probation and issued warrants for his arrest. *Id.* Those warrants were not executed until September 21, 1995. *Id.* On October 25, 1995, over two years after his original sentence, "the district court revoked the

appellant's probation because he failed to pay the court-ordered assessments and because he did not attend NWNI School." *Id.* Rather than putting the probationer in jail, "the district court suspended its revocation order and added more conditions to his probation . . . ." *Id.*

The probationer subsequently failed to meet the terms of this new order and he was served with an arrest warrant on July 2, 1997. *Id.* On July 22, 1997, <u>four years after the probationer's original sentence</u>, the district court held "a revocation hearing, apparently revoking the appellant's probation and ordering the appellant to 'serve out' his fines and costs in jail at the rate of $15 per day." *Id.*

The probationer claimed in his habeas petition that "the district court did not have jurisdiction to revoke his probation because . . . his probationary term had expired at the time of the July 22, 1997, revocation order." *Id.* at 675. In reaching that jurisdictional issue, the Alabama Criminal Court of Appeals, after examining several different cases, defined "maximum probation period" to mean:

> From our examination of the above cases, it is apparent that the "maximum probationary period" a defendant can serve is no more than a total of two years on probation for a misdemeanor conviction and a total of five years on probation for a felony conviction. The trial court retains jurisdiction to revoke a defendant's probation if the revocation proceedings are instigated during the actual court-ordered probationary period, or before the end of the maximum statutorily allowed period. <u>The issuance of an arrest warrant is sufficient to initiate revocation proceedings and to toll the running of the probation period</u>.

*Id.* at 678 (emphasis added).

In overruling a prior APS case, the *Owens* court further clarified:

> We also disagree with the majority's apparent holding in *Miller* that actual incarceration of a delinquent probationer is necessary to toll the probation period—the majority determined that Miller's initial arrest was not sufficient to toll the running of the probationary period because Miller was not incarcerated, but rather his probation was reinstated at that point. This is contrary to the cases that preceded *Miller*. Moreover, § 15-22-54(d)(1) gives the trial court a number of options when a probationer is delinquent—arrest is not the only option. <u>We will not place the trial court in the untenable position of having to incarcerate a probationer simply to avoid losing jurisdiction</u>.

> Accordingly, <u>we overrule our holding in *Miller*, and the cases cited therein, to the extent that it implies that the maximum probation period can never exceed two years from the date of sentencing for a misdemeanor offense</u> and five years from the date of sentencing for a felony offense. In addition, we overrule our holding in *Miller*, however implicit, that the "overt act" necessary to toll the running of the probation period can be no less than the actual incarceration of a delinquent probationer. <u>As set out in § 15-22-54 and the pre-*Miller* cases, there are several alternative methods by which probation revocation proceedings can be initiated that will toll the running of the probation period</u>.

*Owens*, 728 So. 2d at 679-680 (emphasis added).

After undergoing this analysis, the *Owens* court determined that the district court still had jurisdiction over the probationer when his probation was revoked. *Id.* at 680. More specifically, as a result of the multiple intervening tolling periods, he "had served approximately 18 1/2 months of the original 24-month probation." *Id.* Consequently, the probationer's habeas petition was denied.

Here, Plaintiffs superficially acknowledge that tolling can have an impact on how to calculate their maximum probationary period. Concerning Mr. Loyd, Plaintiffs state "[t]here is no court record to indicate that his probation was revoked or that his probationary period was tolled for any reason." (Doc. 80 at 7 ¶ 6). Plaintiffs subsequently indicate the same thing about Mr. Hunter. (*Id.* at 14 ¶ 49). Further, in a footnote within the argument section of both briefs, Plaintiffs maintain that "[t]here is no [written] evidence that the sentenced probation periods were ever tolled or extended." (Doc. 80 at 50 n.15); (Doc. 83 at 65 n.10). However, to the extent that this is a factual argument, the burden is on Plaintiffs to come forward with evidence establishing their factual contention that the absence of <u>written</u> orders excludes any <u>oral</u> orders. And, to the extent that this is a legal argument, the burden is on the Plaintiffs to cite authority supporting this argument. Plaintiffs have failed to do either.

Additionally, as the City points out in its reply, Plaintiffs fail to factor in the multiple times in which the AMC issued warrants for their arrest and/or the ECCRP Defendants sent return to court forms out for their multiple violations of the CRP. (*See* Doc. 88 at 4 ¶ 21 ("There are, in fact, a multitude of court records indicating that [Mr.] Loyd was not in compliance with the terms of his probation (and, therefore, the municipal court may have determined and/or considered his probationary period tolled during the extended and repeated periods of noncompliance)."); *id.* at 7-8 ¶ 49

(stating same with respect to Mr. Hunter's AMC records)); *cf.* Ala. Code § 12-23-8 ("Compliance with any order authorized pursuant to this chapter relating to education and/or treatment may be enforced by the court through exercise of its contempt powers; or, where made a condition of probation, by revocation thereof for non-compliance.") (emphasis added). Plaintiffs also have not discussed to what extent a recorded infraction relating to the CRP (in the absence of issuing an arrest warrant) can serve to toll the maximum probationary period.

Concerning Mr. Hunter more specifically, Plaintiffs do not address the fact that he was ordered to complete the CRP in two different misdemeanor cases–that is once on March 29, 2007, in MC07-0143, and a second time on March 25, 2010, in MC10-0083. Instead, Plaintiffs simplistically add two years to the date of each Plaintiff's respective original suspended sentence and maintain that Defendants have violated state law because Plaintiffs were still subject to the CRP requirements after that two-year lapse in time.

As *Owens* reveals, however, Plaintiffs' calculation of the maximum probation period under the APS and the AMCPS is substantively wrong because it fails to account for return to court orders, arrest warrants, and other events that support

tolling.[23] Further, it is not this Court's responsibility to figure out the proper calculation for them in light of the various return to court orders and warrants issued for their noncompliance with the CRP. Thus, summary judgment is due to be granted in favor of Defendants on Plaintiffs' constitutional counts for the alternative reason that Plaintiffs have not shown that their time spent in the CRP–when factoring in tolling–exceeded the two-year limitation for misdemeanor probation under Alabama law.[24]

### 3. Plaintiffs' federal constitutional counts alternatively fail for lack of causation.

In *Kentucky*, the Supreme Court summarized the element of causation in a § 1983 action:

> On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *See, e.g.*, *Monroe v. Pape*, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation, *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S. Ct. 445, 454, 70 L. Ed. 2d 509 (1981) (quoting *Monell, supra*, 436 U.S., at 694,

---

[23] The Court acknowledges that the *Ray* court found that a triable issue as to tolling prevented summary judgment for JCS regarding due process. (*Ray*, Doc. 626 at 63). However in *Ray*, "a reasonable jury could find from the summary judgment record that JCS invariably recalculated probation following purported reinstatements by extending the sentence 24 months from the reinstatement date." *Id.* That caliber of evidence does not exist in this case.

[24] Because Plaintiffs have not shown a triable violation of Alabama law, the Court does not further discuss the second aspect of notice and an opportunity to be heard.

98 S. Ct., at 2037); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.

473 U.S. at 166;[25] *see also Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)

("[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation.").

In this section, the Court focuses upon § 1983 causation as it pertains to Defendants' alleged Fourteenth Amendment due process violation for keeping Plaintiffs in the CRP too long. As set out above, Plaintiffs have not established how any of the other alleged wrongful conduct engaged in by the ECCRP Defendants —including imposing graduated sanctions without the AMC's permission and failing to provide written warnings of impending CRP termination—rises to the level of a federal constitutional concern.[26] Consequently, there is no need to reach the causation element for those purported offenses against the ECCRP Defendants. Also, Plaintiffs have limited their federal claim against the City to their maximum probation period theory.

---

[25] In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978), the Supreme Court overruled *Monroe* "insofar as it holds that local governments are wholly immune from suit under § 1983."

[26] The Court acknowledges that Plaintiffs have pointed to testimony from Ms. Zaner indicating that graduated sanctions were imposed without obtaining approval from the AMC, in violation of the CROFM. A reading of the record in the light most favorable to Plaintiffs also reveals that a reasonable jury could conclude that Plaintiffs did not receive written warnings about their impending termination from the CRP. However, Plaintiffs have made no effort to show how these or other CROFM violations by the ECCRP Defendants constitute viable constitutional claims under the Fourth, Eighth, or Fourteenth Amendments.

55

## The ECCRP Defendants

The Court first evaluates causation with respect to the ECCRP Defendants. Here, no reasonable jury could conclude that Ms. Zaner caused Plaintiffs a federal constitutional deprivation tied to their maximum probation period, much less that Ms. Zaner or the ECCRP was the moving force behind such deprivation(s). Unlike the situation in *Ray*, Plaintiffs have pointed to no evidence that the ECCRP Defendants affirmatively "extended . . . probation sentences for earlier charges by 24 months when the Municipal Court actually issued probation orders in different case." (*Ray*, Doc. 626 at 62). There also are no written orders from the AMC discharging Plaintiffs from probation or indicating that they were not required to complete the CRP. Consequently, there is no evidence that the ECCRP Defendants deviated from the AMC's orders by requiring Plaintiffs to participate in the CRP after the AMC had discharged them from probation, discharged them from the CRP, and/or closed their misdemeanor cases. Yet, the burden of proof is on Plaintiffs to prove each element of their claims. (*Cf. Ray*, Doc. 626 at 62-63 ("Nothing in the Rule 56 record indicates that JCS employees informed [the plaintiffs] of these modifications to their 2009 and 2011 probation sentences. Nor does the record reflect that the Municipal Court agreed to these modifications.")).

Dissimilar from *Ray*, the record here also lacks documentary evidence that the

ECCRP Defendants "invariably recalculated probation following purported reinstatements by extending the sentence [of] 24 months from the reinstatement date." (*Ray*, Doc. 626 at 63). The record further lacks evidence that the AMC ever relied upon the ECCRP Defendants to provide it with probation period calculations, much less that the ECCRP Defendants had policies governing how to make those determinations. (*Cf. Ray*, Doc. 626 at 64 ("These JCS policies instructed employees to extend the length of probation cases until all amounts owed were paid, prevented probation terms from running consecutively, and <u>granted considerable discretion to JCS employees to determine the amount of time left on a reinstated probation case</u>.") (emphasis added)).

Plaintiffs are correct that their AMC files do not contain written orders returning them to the CRP (after termination for non-compliance). Ms. Zaner has testified that the AMC would indicate this orally in open court. (*See, e.g.*, Doc. 70-2 at 12 at 328 ("When they reappear in court, they would have to restart [the CRP], the order by the judge to restart. I'm not allowed to accept them back into the program unless the judge orders them back into the program. . . . Q.  And you're going by based on what you hear in the courtroom as compared to what is actually written

down on the order sheet? A. Correct.")).[27] Plaintiffs have not refuted Ms. Zaner's testimony[28] nor otherwise shown that it was somehow unlawful–under either federal or Alabama law–for the ECCRP Defendants to rely upon an oral order from the AMC about a probationer's need to continue treatment pursuant to the CRP. While Plaintiffs certainly have shown a lack of detail with the ECCRP Defendants' paperwork, such imperfection (without more) falls short of establishing a causal connection to any due process injury or other purported constitutional harm.

Instead, the only conceivable entity that caused Plaintiffs to be subject to the CRP beyond the statutory maximum period (if in fact they both were so subject after factoring in the APS/AMCPS's tolling framework) without prior notice or an opportunity to be heard was <u>non-party AMC</u>. Further, to the extent that Plaintiffs believed that the AMC was unlawfully continuing its jurisdiction over them by returning them to the CRP beyond their applicable statutory maximum period, then redress was available through a motion asking the AMC to enter an order of discharge or to review the amount of time remaining under the maximum probation term.

---

[27] The first page references to Doc. 70-2 correspond with the Court's CM/ECF numbering system.

[28] The Court acknowledges Plaintiffs' assertion that certain portions of Ms. Zaner's testimony are hearsay and should be stricken. (*See, e.g.*, Doc. 83 at 4 ¶ 78; *id.* at 6 ¶ 189; *id.* at 7 ¶ 190). However, Plaintiffs never filed a separate motion to strike Ms. Zaner's testimony nor otherwise developed their hearsay objection. Accordingly, any request by Plaintiffs to disregard Ms. Zaner's testimony about oral orders from the AMC pertaining to Plaintiffs' obligation to continue with the CRP is denied as undeveloped.

Importantly, both the APS and the AMCPS provide that the only entity with the power to discharge a person from probation is the court with jurisdiction over that probationer. *See* Ala. Code § 15-22-54(a) ("When the conditions of probation or suspension of sentence are fulfilled, the court shall, by order duly entered on its minutes, discharge the defendant."); Ala. Code § 12-14-13(h) ("Upon the satisfactory fulfillment of the conditions of probation or suspension of sentence, the court shall, by order duly entered on the minutes, discharge the defendant.").

Plaintiffs also could have brought a habeas challenge, which apparently at least one plaintiff in the *Brannon* action attempted (unsuccessfully) to do. (*Brannon*, Doc. 172 at 6 (N.D. Ala. July 24, 2017)). Regardless, Plaintiffs have failed to present proof from which a reasonable jury could conclude that the ECCRP Defendants caused or were the moving force behind extending Plaintiffs' probationary term (through continuation of the CRP) beyond the state statutory maximum without prior notice and an opportunity to be heard. Thus, summary judgment is alternatively due to be granted due to the absence of a triable issue of § 1983 causation against the ECCRP Defendants with respect to any Fourteenth Amendment due process claim (or any other federal claim) tied to the two-year maximum probation period.

**The City**

Citing to *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992), Plaintiffs assert

that "judges can institute municipal policy regarding actions taken pursuant to their administrative roles[.]" (Doc. 80 at 41). As the Fifth Circuit fully explained in *Moore*:

> We have repeatedly held, however, that a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker. *See Bigford v. Taylor*, 834 F.2d 1213, 1221-22 (5th Cir.), *cert. denied*, 488 U.S. 851, 109 S. Ct. 135, 102 L. Ed. 2d 108 (1988); *Carbalan v. Vaughn*, 760 F.2d 662, 665 (5th Cir.), *cert. denied*, 474 U.S. 1007, 106 S. Ct. 529, 88 L. Ed. 2d 461 (1985); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (distinguishing judge's administrative duties, actions pursuant to which may constitute county policy under *Monell*, from judge's judicial function, in which he or she effectuates state policy by applying state law).
>
> Johnson does not contend, in his complaint below or in his brief on appeal, that Judge Moore sentenced him to jail pursuant to the judge's administrative or other non-judicial duties. He argues only that, under *Pembaur*, the municipal judge is a final policymaker whose official actions constitute municipal policy. This argument ignores the distinction we have consistently drawn between a judge's judicial and administrative duties. Only with respect to actions taken pursuant to his or her administrative role can a judge be said to institute municipal policy under *Pembaur* and *Monell*. Johnson's complaint fails to show that his constitutional rights were violated as a result of the city's official policy. The district court did not err when it dismissed Johnson's claims against the city and Judge Moore in his official capacity.

*Moore*, 958 F.2d at 94 (5th Cir. 1992) (emphasis added).[29]

As an initial matter, *Moore* makes it clear that the City cannot be held liable under § 1983 for AMC orders that required Plaintiffs to restart the CRP. (*See also*

_____

[29] Although *Moore* is non-binding authority, this Court is persuaded by it especially as it express relies upon the pre-*Bonner Briscoe* decision.

Doc. 72 at 52-54 (citing collection of cases observing that a local judge's actions in his judicial capacity are not attributable to a municipality under § 1983)).[30] This is because the AMC was functioning in a judicial role and not an administrative one. Further, *Moore* does not provide that an exception to the judicial function exists if the court or judge misapplies the law. For this case, that means it is of no legal consequence that the AMC <u>may</u> have improperly continued Plaintiffs on the CRP in conflict with the AMTA and the AMCPS–the City cannot be held liable under § 1983 based upon the AMC's judicial conduct.

In light of *Moore*, Plaintiffs attempt to characterize their continuation with the CRP as an administrative failure of the AMC. (*See, e.g.*, Doc. 80 at 42 ("Without having conversations, reviewing the case plan recommendations, being aware of [the CRP] participants['] progression, and approving or denying requests for graduated sanctions, it would be impossible for the court to properly carry out its supervision of ECCRP.")); *id.* at 43 ("This is enough to create evidence of a policy or custom on behalf of the municipal court of not reviewing case management plans, not reviewing ECCRP recommendations for treatment, and not reviewing the [CRP] participants['] progress, although all of these activities are essential for the court to properly carry out its administrative function in supervising ECCRP."). The problem with this logic

---

[30] All page references to Doc. 72 correspond with the Court's CM/ECF numbering system.

is the lack of a casual connection between increasing the AMC's supervision over the ECCRP Defendants and any conceivable impact on Plaintiffs' one potentially viable federal claim–a Fourteenth Amendment due process violation based upon exceeding the maximum probation period. More specifically, because the ECCRP Defendants were not tracking any tolling aspects of a maximum probation term, increased supervision of them by the AMC would not have prevented that particular potential constitutional harm.

Plaintiffs' § 1983 claims against the City also fail due to the absence of <u>any</u> evidence that the City exercises control over or establishes policies for the AMC. *See Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1292 (11th Cir. 1998) ("[L]ocal governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control."). In this regard, this Court is persuasively guided by the reasoning in an earlier summary judgment opinion entered in the *Ray* case (relied upon by the City (doc. 72 at 49-52)) which similarly found under comparable circumstances that the municipal court was not a policymaker for the City of Childersburg.

As the *Ray* court explained:

> In light of Alabama's delegation of judicial authority to the state judicial system, it follows as a matter of law and logic that the Municipal Court's judge acted as a state policymaker when sentencing Plaintiffs to probation, setting terms of probation, designating JCS as the probation

agency, and revoking or reinstating probation. This state's supreme law, the Alabama Constitution, designates municipal courts as courts under the unified judicial system. Ala. Cost. of 1901, Art. VI, § 139(a). *See Turquitt*, 137 F.3d at 1288 (relying, in the first instance, on the Alabama Constitution's designation of a sheriff as a state official). The Alabama Supreme Court, a state agency, held the authority to create procedural and administrative rules that regulated the Municipal Court. Ala. Code § 12-2-19(a). *See Turquitt*, 137 F.3d at 1289 (relying on a state agency's control of rules regarding the policy at issue as evidence that the sheriff had acted as a state policymaker). And it is state law that provides the Municipal Court authority to impose probation on defendants, not the City's municipal code. *See* Ala. Code § 12-14-13(a), (d). Finally, a state court—the Court of the Judiciary—is responsible for sanctioning a municipal court's judge for misconduct or ethical violations. *See* Ala. Const. of 1901, Art. VI, §§ 156 & 157. *See also Grech*, 335 F.3d at 1347 (considering a state agency's control over sanctions as evidence that a sheriff acted as a state policymaker when maintaining warrant records). Although the City paid Judge Ward's salary, that fact alone did not grant the City control over him. *Cf. Turquitt*, 137 F.3d at 1290 (recognizing that an Alabama sheriff was not a county official even though his salary was paid by a county). Because the Municipal Court's judge was a member of the state's judicial system, implemented state law when issuing and supervising probation sentences, and was subject to the disciplinary control of a state agency, the court finds that he acted as a state policymaker, not a municipal policymaker, when implementing probation policies at issue in this case.

*Ray v. Judicial Corr. Servs., Inc.*, No. 2:12-CV-02819-RDP, 2017 WL 660842, at *13

(N.D. Ala. Feb. 17, 2017) (emphasis added) (footnotes omitted).

Plaintiffs make no effort to counter this reasoning in *Ray*. Plaintiffs also fail to

identify what evidence exists from which a reasonable jury could conclude that the

AMC is a policymaker for the City. Thus, Plaintiffs' federal claims brought against

the City are alternatively subject to summary judgment due to the absence of a triable

issue of § 1983 causation.

### 4.  Ms. Zaner is entitled to qualified immunity.

Ms. Zaner has separately asserted the defense of qualified immunity.[31] (*See generally* Doc. 74). Ms. Zaner (to the extent that she should be afforded the same immunity protections as a public official)[32] can appropriately assert a qualified

---

[31]  The ECCRP passingly mentions qualified immunity in the context of its asserted quasi-judicial immunity defense. (Doc. 73 at 34). This Court has previously explained why the ECCRP, as an entity, cannot benefit from qualified immunity. (Doc. 62 at 31-32). Consequently, to the extent that the ECCRP has reasserted qualified immunity on summary judgment, that defense is, again, rejected as simply inapplicable to it. *Cf. also Owen v. City of Indep.*, 445 U.S. 622, 638 n.18 (1980) (explaining that a municipality (unlike an individual) has only one capacity under § 1983); *id.* at 638 ("[A] municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983.").

[32]  In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court determined that private prison guards were not entitled to assert a qualified immunity defense to alleged liability brought against them under § 1983:

> Our examination of history and purpose thus reveals nothing special enough about the job or about its organizational structure that would warrant providing these private prison guards with a governmental immunity. The job is one that private industry might, or might not, perform; and which history shows private firms did sometimes perform without relevant immunities. The organizational structure is one subject to the ordinary competitive pressures that normally help private firms adjust their behavior in response to the incentives that tort suits provide-pressures not necessarily present in government departments. Since there are no special reasons significantly favoring an extension of governmental immunity, and since *Wyatt* makes clear that private actors are not *automatically* immune (*i.e.*, § 1983 immunity does not automatically follow § 1983 liability), we must conclude that private prison guards, <u>unlike those who work directly for the government</u>, do not enjoy immunity from suit in a § 1983 case. *Cf. Forrester v. White*, 484 U.S., at 224, 108 S. Ct., at 542 (Officers "who seek exemption from personal liability have the burden of showing that such an exemption is justified"); *see also Butz*, 438 U.S., at 506, 98 S. Ct., at 2910-2911.

*Richardson*, 521 U.S. at 412 (emphasis by underlining added). *Richardson* did not reach whether the prison guards could be held liable under § 1983 "even though they are employed by a private firm."

64

immunity defense. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id*.

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman*

---

*Id.* at 413. Instead, the Supreme Court instructed that it was "for the District Court to determine whether, under this Court's decision in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982), defendants actually acted 'under color of state law.'" *Richardson*, 521 U.S. at 413. In contrast to *Richardson*, the Supreme Court found in *Filarsky* that a private attorney retained to assist in the investigation of a municipal employee's potential wrongdoing was entitled to qualified immunity for any alleged liability within the scope of that role. 566 U.S. at 393-94.

The parties have not cited to any controlling authority that addresses the availability of a qualified immunity defense to a private court referral officer. However, the ECCRP Defendants also have not argued that Ms. Zaner is not subject to suit under § 1983. *See Lugar*, 457 U.S. at 937 (observing that when a private party is sued under § 1983 "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State" and discussing "a two-part approach to this question of 'fair attribution'"). For the purposes of this alternative basis in support of summary judgment, the Court has assumed that Ms. Zaner can be sued under § 1983 and also assert a qualified immunity defense but acknowledges, given her private status, the debatable nature of these open questions.

*v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function[.]" *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified in application by Pearson v. Callahan*, 555 U.S. 223, 227 (2009) (holding that "*Saucier* procedure should not be regarded as an inflexible requirement"). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206.

The "unlawfulness must be apparent" under preexisting law.[33] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable state actor would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' <u>at the time it was taken[.]</u>") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th

---

[33]   Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this case. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson*, 555 U.S. at 236, in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227 (1991). Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did. *Malley*, 475 U.S. at 341.

Based upon the foregoing principles, Ms. Zaner is entitled to qualified immunity. In terms of the threshold inquiry, Plaintiffs offer no on-point cases to show

that Ms. Zaner was acting outside the scope of her discretionary authority as a court referral officer and/or the head of the ECCRP concerning their constitutional claims. (Doc. 83 at 53-55). While Plaintiffs point out that qualified immunity does not protect a defendant from liability for "ministerial" acts or omissions (doc. 83 at 52), the Court disagrees with them that the CROFM transforms Ms. Zaner's job into one in which she exercises <u>no</u> discretion. Importantly, Plaintiffs do not set out any provisions of the CROFM that even pertain to calculating a probation term. Plaintiffs also do not show that Ms. Zaner was ever "act[ing] entirely on [her] own behalf" or "acting <u>wholly</u> outside the scope of [her] discretionary authority[.]" *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (emphasis added).

Having found that Plaintiffs' constitutional claims do intersect with Ms. Zaner's exercise of discretionary authority, qualified immunity applies because Plaintiffs have failed to establish a triable constitutional claim. In the absence of a viable constitutional claim, Ms. Zaner cannot be personally liable to Plaintiffs under § 1983 for her own conduct or in a supervisory capacity.

Alternatively, even when assuming that Plaintiffs have adduced sufficient evidence from which a reasonable jury could find a viable Fourteenth Amendment due process (or other federal constitutional) violation, Plaintiffs have not pointed to (and the Court has not independently found) any clearly established law that would

have put Ms. Zaner on notice of her unconstitutional conduct. More specifically, the law was not clearly established that Ms. Zaner violated Plaintiffs' due process rights under the Fourteenth Amendment by failing to track Plaintiffs' maximum probation periods under the APS and/or the AMCPS. Indeed, as mentioned earlier, neither the AMTA–the statute that governs court referral officers like Ms. Zaner–nor the CROFM expressly renders her responsible for keeping track of maximum probation periods. Additionally, it is an open question under Alabama law whether completion of the CRP is even subject to the two-year maximum probation period.

Finally, to the extent that Plaintiffs contend that Ms. Zaner violated any other federal constitutional rights, they have offered no clearly-established controlling case authority for that supposed violation. Thus, qualified immunity provides an alternative basis for granting summary judgment to Ms. Zaner on Plaintiffs' federal constitutional claims.

### 5. The ECCRP Defendants have not carried their burden to show that they are entitled to quasi-judicial immunity.

The ECCRP Defendants also assert that they are entitled to quasi-judicial immunity. (Doc. 73 at 31-38). While the Court disagrees with Defendants that such a defense is available to the ECCRP as an entity, conceivably Ms. Zaner might have a right to rely upon that immunity. However, unlike the example of *Filarsky* in the

context of Ms. Zaner's qualified immunity defense, Defendants have provided no examples of cases in which a private individual (as opposed to a public non-judicial official) was protected by such a defense.[34] Therefore, the Court rejects this part of the ECCRP Defendants' Motion as underdeveloped.

> ### 6. The Court does not reach the merits of the other grounds relied upon by Defendants to support a dismissal of Plaintiffs' constitutional claims.

The remaining grounds that Defendants rely upon in support of dismissing Plaintiffs' federal claims include statute of limitations (doc. 72 at 32-33); (doc. 73 at 38-39); *Rooker-Feldman* (doc. 73 at 39-40), and *Heck v. Humphrey*'s favorable-termination rule. (*Id.* at 39-43). In light of the foregoing analysis, the Court finds that reaching these remaining issues pertaining to Plaintiffs' federal claims is unnecessary. This is particularly so as Defendants' statute-of-limitations defense is a partial one that seeks only to dismiss alleged misconduct that occurred before July 1, 2011 (doc. 72 at 33); (doc. 73 at 38-39), and because the Court has previously explained why *Rooker-Feldman* and *Heck v. Humphrey* do not bar Plaintiffs' federal claims. (*See Brannon*, Doc. 62 at 15-24 (discussing why *Rooker-Feldman* does not preclude Plaintiffs' claims); *id.* at 24-30 (discussing why *Heck v. Humphrey* does not preclude

---

[34] The ECCRP Defendants' cases likewise lack an example of a private <u>entity</u> benefitting from quasi-judicial immunity.

Plaintiffs' claims)). Accordingly, those portions of the ECCRP Defendants' Motion and the City's Motion challenging Plaintiffs' federal claims are due to be termed as moot.

## B. Plaintiffs' Alabama Common-Law Counts

The Court now evaluates Plaintiffs' Alabama common-law counts asserted against Defendants. The Court begins with an analysis of the abuse of process claim brought against the ECCRP Defendants only.

### 1. Plaintiffs have abandoned their abuse of process claim against the ECCRP Defendants.

The ECCRP Defendants assert that Plaintiffs lack evidence to support a triable abuse of process claim under Alabama law. (Doc. 73 at 46-47). In responding to the ECCRP Defendants' Motion, Plaintiffs do not ever specifically mention their abuse of process claim much less address the ECCRP Defendants' contentions offered in support of dismissal. (*See generally* Doc. 83).

Plaintiffs' failure to acknowledge their abuse of process claim constitutes an abandonment of it. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d

1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Hudson v. Norfolk Southern Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citing *Dunmar*, 43 F.3d at 599)); *cf. McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"). Thus, the Court finds that summary judgment is appropriate on Plaintiffs' Count Sixteen.

### 2.    Plaintiffs have abandoned their false arrest/false imprisonment claims against all Defendants.

Both the ECCRP Defendants and the City assert that Plaintiffs lack evidence to support a triable false arrest/false imprisonment claim under Alabama law. (Doc. 73 at 47-48); (Doc. 72 at 61-63). Plaintiffs do not ever specifically mention their false

arrest/false imprisonment claims in opposing summary judgment much less address Defendants' respective contentions offered in support of dismissal. (*See generally* Docs. 83, 80). Based upon Plaintiffs' silence and the collection of cases cited in the abuse of process subsection immediately above, the Court finds that they have abandoned all false arrest/false imprisonment claims. Thus, the Court finds that summary judgment is appropriate on Plaintiffs' Counts Thirteen and Fifteen.

### 3. Plaintiffs cannot support a negligent training and/or supervision claim against any Defendant.

Unlike their abuse of process and false arrest claims, Plaintiffs do resist a dismissal of their negligent training claims against the ECCRP Defendants and the City. (Doc. 83 at 68-71); (Doc. 80 at 46-48).

As the Supreme Court of Alabama has observed concerning this claim:

> [I]n order for an employer to be liable for the negligent hiring, training, retention, and supervision of its employee, the plaintiff must also prove "wrongful conduct" on the part of the employee. *University Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003) ("[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents."); *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003) ("A party alleging negligent or wanton supervision and hiring must also prove the underlying wrongful conduct of employees."); *see also Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999) (holding that a jury verdict against an employer based on negligent training and supervision of a supervisor who allegedly sexually harassed a fellow employee could not stand where the jury also exonerated the supervisor); *Smith v. Boyd Bros. Transp., Inc.*, 406 F. Supp. 2d 1238, 1248 (M.D. Ala. 2005) ("Under Alabama law, the finding of underlying tortious conduct is a precondition to invoking

> successfully liability for the negligent or wanton training and
> supervision of an employee."); and *Thrasher v. Ivan Leonard Chevrolet,
> Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) ("In order to establish
> a claim against an employer for negligent supervision, training, and/or
> retention, the plaintiff must establish that the allegedly incompetent
> employee committed ... [a] tort.").

*Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 304 (Ala. 2010). The *Jones* court summarized these cases to mean, "implicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that *caused* the plaintiff's injury." *Id.* at 305 (emphasis in original).

Consistent with the Court's earlier analysis in § V.A.1-3 and the above collection of Alabama cases, Plaintiffs' negligent training and/or supervision count fails against the ECCRP because there is insufficient evidence of any underlying wrongful conduct committed by Ms. Zaner (or any other employee of the ECCRP for that matter) against Plaintiffs. Similarly, there is an absence of proof that any employee under the control or direction of the City engaged in wrongful conduct with respect to Plaintiffs.

Additionally, Ms. Zaner cannot be liable for negligent training or supervision because the ECCRP is the employer and not her. Importantly, Plaintiffs have not cited to any examples of cases in which a supervisor or manager (as opposed to an employer) has been held individually liable for negligent training under Alabama law.

Alternatively, to the extent that Plaintiffs can show a violation of a federal constitutional law, the AMTA, the APS, or the AMCPS by Ms. Zaner (or some other ECCRP employee) for failing to track maximum probation periods and/or continuing to keep Plaintiffs in the CRP beyond the two-year limit, this Court is persuaded that such wrongdoing is still inadequate to support an Alabama negligent training claim.

As an initial matter, Plaintiffs have not referred to any Alabama cases which have recognized that evidence of an underlying federal constitutional violation or a state statutory violation (of the AMTA, APS, or the AMCPS) may serve as a viable anchor for a negligent training claim.[35] With respect to statutory violations more specifically, several Alabama Supreme Court cases have indicated that, for a negligent training claim to be viable, an agent's wrongdoing cannot be based solely upon a statute.[36] *See, e.g.*, *Johnson v. Brunswick Riverview Club, Inc.*, 39 So. 3d 132, 139 (Ala. 2009) (reasoning in its rejection of the plaintiff's negligent training and supervision claim tied to Alabama's Dram Shop Act that, Alabama "does not recognize a common law cause of action for negligence in the dispensing of alcohol." (emphasis added) (internal quotation marks omitted) (quoting *Ward v. Rhodes,*

---

[35] Due to Plaintiffs' abandonment of their abuse of process and false arrest claims, no common-law claim remains to support their negligence claim.

[36] As the CROFM is a product of the AMTA, this Court sees no reason why a violation of the CROFM would not likewise be an unsuitable anchor for negligent training.

*Hammonds & Beck, Inc.*, 511 So. 2d 159, 164-65 (Ala. 1987))); *Gilmer v. Crestview Mem'l Funeral Home, Inc.*, 35 So. 3d 585, 596 (Ala. 2009) (rejecting "negligent-supervision claim . . . based solely on [the] violation of [Alabama's embalming] statute"); *see also Guy v. Alabama Power Co.*, No. 2:13CV8-MHT, 2013 WL 3929858, at *2 (M.D. Ala. July 29, 2013) ("[T]he tort does not include those instances where the wrongful conduct is based on only an Alabama statute.").Thus, persuaded by *Johnson*, *Gilmer*, and *Guy*, the Court alternatively concludes that Ms. Zaner's purported violations of the AMTA, APS, and the AMCPS cannot support Plaintiffs' negligent training count. *Cf. Guy*, 2013 WL 3929858, at *5 ("[E]ven if *Jones* did create an opening for a claim against employers for the negligent or wanton hiring, training, and supervision of their employees based on their employees' wrongdoings <u>other than those prohibited by common-law torts</u>, this court cannot conclude that the statute[s] that [Plaintiffs] cite[] would be such [] bas[e]s.") (emphasis added). Based upon this identical reasoning, the Court similarly finds that the City cannot be held liable for negligent training based upon purported violations of the AMTA, APS, and the AMCPS.

As for negligent training based upon any purported constitutional violations, the Court agrees with *Guy* that:

> [I]t is clear that the employee's wrongdoing must be based on state, and not federal, law. Otherwise, the tort of negligent or wanton hiring,

training, and supervision could be a corridor through which federal laws prohibiting various types of conduct by employees could be incorporated into state law as a privately redressable requirement on employers to stop their employees from engaging in such conduct. "[M]ak[ing] an educated guess of how the Alabama courts, and, in particular, the Alabama Supreme Court," would answer this question, *Palmer v. Infosys Technologies Ltd. Inc.*, 888 F. Supp. 2d 1248, 1252 (M.D. Ala. 2012) (Thompson, J.), this court confidently doubts that the *Jones* court intended such potentially indiscriminate and broad incorporation of federal law into state law.

*Guy*, 2013 WL 3929858, at *2 (emphasis added). In *Guy*, the district court dealt with a negligent training claim premised upon an Alabama statute–Ala. Code § 31-12-2– that expressly invokes the federal Uniformed Services Employment and Reemployment Rights Act ("USERRA") as applicable to the Alabama National Guard. 2013 WL 3929858, at *4. This Court sees no reason why a negligent training claim based upon an employee's federal unconstitutional conduct should be treated any differently than one based upon federal statutory violations. Accordingly, this Court alternatively concludes that, as a matter of law, Plaintiffs cannot rely upon evidence of a federal constitutional violation to support their Alabama negligent training count.

Finally, *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665 (Ala. 2001), provides another reason why Plaintiffs cannot prevail on their negligent training claim. *Armstrong* addresses the element of notice in connection with asserting negligent training:

> A plaintiff must establish "by affirmative proof" that the employer actually knew of the incompetence, or that the employer reasonably should have known of it. *Lane v. Central Bank*, 425 So. 2d 1098, 1100 (Ala. 1983), quoting *Thompson v. Havard*, 285 Ala. 718, 723, 235 So. 2d 853, 858 (Ala. 1970). To carry this burden, <u>the plaintiff may show either that he informed the employer about specific misdeeds of the employee, or that the employee's misdeeds were "of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice</u>." *Lane*, 425 So. 2d at 1100.

*Armstrong*, 817 So. 2d at 683 (emphasis added). Here, Plaintiffs have provided no affirmative proof that they complained (pre-lawsuit) to Ms. Zaner or anyone else at the ECCRP about the wrongful conduct or incompetence that they perceived was taking place with respect to their maximum probation terms. They similarly have not established that they complained to anyone at the City about any alleged wrongful conduct or incompetence.

Further, allegations that Ms. Zaner made mistakes, without more, "do not amount to proof that [the ECCRP] was aware [or reasonably should have been aware] of and, negligently or wantonly, disregarded acts of incompetence by [Ms. Zaner] that damaged [Plaintiffs]." 817 So. 2d at 683. In particular, as the record lacks any straightforward statutory wrongdoing on the part of Ms. Zaner, the ECCRP cannot be subject to liability for failing to reasonably take notice of such dubious incompetence. *Cf. Armstrong*, 817 So. 2d at 682 ("[I]t is proper, <u>when repeated acts of carelessness and incompetency of a certain character</u> are shown on the part of the

servant to leave it to the jury whether they would have come to [the employer's] knowledge, had he exercised ordinary care." (emphasis added) (internal quotation marks omitted) (quoting *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993), *abrogated on other grounds by statute as stated in Horton Homes, Inc. v. Brooks*, 832 So. 2d 44, 57 (Ala. 2001))). This same absence-of-notice analysis applies equally to any purported liability of the City.

Thus, summary judgment is appropriate on Plaintiffs' Counts Seventeen and Nineteen for these alternative reasons.

> **4.** **The City cannot be held liable to Mr. Loyd on any state law claims because there is no proof that he ever filed a sworn statement of claim as required under Alabama law.**

In its Motion, the City additionally asserts that Mr. Loyd's state law claims fail because he never filed a sworn statement of claim as required by Alabama law. (Doc. 72 at 59-60); *see also* Ala. Code § 11-47-192 ("No recovery shall be had against any city or town on a claim for personal injury received, unless a sworn statement be filed with the clerk by the party injured . . . stating substantially the manner in which the injury was received, the day and time and the place where the accident occurred and the damages claimed.").

In opposing the City's Motion, Plaintiffs do not mention anything about Mr. Loyd and instead focus upon whether on not Mr. Hunter filed a timely notice of

claim. (*See* Doc. 80 at 45 ("Defendant's assertion that [Mr.] Hunter did not file his claim within six months fails because Defendant has ignored [Mr.] Hunter's damages in calculating the accrual of his claims.")). Plaintiffs also do not point to any notice of claim filed by Mr. Loyd. Thus, the Court finds that summary judgment for the City on Mr. Loyd's state law claims is alternatively appropriate due to the absence of any proof that he complied with Ala. Code § 11-47-192.

### 5. The Court does not reach the merits of the other grounds relied upon by Defendants to support a dismissal of Plaintiffs' common-law claims.

In light of the foregoing analysis, the Court finds that reaching the remaining issues pertaining to Plaintiffs' common-law claims is unnecessary. This includes the disputed issue of whether Mr. Hunter's notice of claim was timely filed. Thus, any remaining portions of the City's Motion or the ECCRP Defendants' Motion relating to Plaintiffs' common-law claims is due to be termed as moot.

### C. Summary Judgment Is Appropriate on Plaintiffs' Count for Declaratory Relief.

Defendants challenge Plaintiffs' ability to assert claims against them for declaratory relief. (Doc. 73 at 49); (Doc. 72 at 73-74). In opposition, Plaintiffs do not address the viability of their declaratory count and, consequently, the Court finds that they have abandoned it. Thus, the Court concludes that summary judgment is appropriate on Plaintiffs' Count Twenty. (*See generally* Docs. 83, 80).

**D.     Plaintiffs' Claim for Injunctive Relief Is Due To Be Dismissed.**

Defendants challenge Plaintiffs' ability to assert claims against them for injunctive relief. (Doc. 73 at 49); (Doc. 72 at 69-72). Unlike their declaratory judgment count, Plaintiffs do resist the dismissal of their claim for injunctive relief. (Doc. 83 at 71-73); (Doc. 80 at 53-55).

Defendants rely upon two different jurisdictional reasons in support of dismissing Plaintiffs' claim for injunctive relief–the absence of standing and the doctrine of mootness. More specifically, Defendants maintain that Plaintiffs are without standing to seek injunctive relief because they are no longer subject to the requirements of the CRP. (Doc. 72 at 69-70); (Doc. 73 at 49). Alternatively, Defendants contend that the relief Plaintiffs seeks has been rendered moot in light of the AMC Standing Order governing probation. (Doc. 72 at 70-73); (Doc. 73 at 49).

In opposition, Plaintiffs only respond to Defendants' mootness contentions. (Doc. 83 at 71-73); (Doc. 80 at 53-55). Consequently, the Court finds that Plaintiffs have abandoned pursuit of their injunctive claim by not addressing Defendants' arguments about the absence of standing. Alternatively, the Court agrees with Defendants that because Plaintiffs are no longer subject to the CRP, they are unable to "show a sufficient likelihood that [they] will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328

(11th Cir. 2013) (internal quotation marks omitted) (quoting *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001))). Thus, Plaintiffs' Count Twenty-One is due to be dismissed for lack of subject matter jurisdiction.

### E. Plaintiffs' Strike Motion Is Due To Be Termed as Moot.

In their Strike Motion, Plaintiffs seek to strike "the declaration of Richard Rhea and all references thereto in Defendant's Reply Brief." (Doc. 90 at 1). Because this Court's analysis on summary judgment does not rely on that challenged declaration or the parts of any reply briefs that refer to it, Plaintiffs' Strike Motion is due to be termed as moot.

## VI. CONCLUSION

Consistent with the foregoing reasoning, both the ECCRP Defendants' Motion and the City's Motion are due to be and hereby are granted in part and otherwise denied and/or termed as moot. Further, Plaintiffs' Strike Motion is due to be termed as moot. Finally, with no pending claims remaining, the Court will enter a separate final judgment order dismissing Plaintiffs' lawsuit.

**DONE** this the 30th day of March, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge